## PENNEKAMP ET AL. v. FLORIDA.

No. 473.   Argued February 8, 1946.—Decided June 3, 1946.

332

*Robert R. Milam* and *Elisha Hanson* argued the cause for petitioners. With them on the brief were *E. T. Mc-Ilvaine* and *Edward E. Fleming*.

*J. Tom Watson*, Attorney General of Florida, *James M. Carson* and *Giles J. Patterson* argued the cause for respondent. With *Messrs. Watson* and *Carson* on the brief was *Sumter Leitner*, Assistant Attorney General.

*William Harrison Mizell* and *Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae*, urging reversal.

Mr. Justice Reed delivered the opinion of the Court.

This proceeding brings here for review a judgment of the Supreme Court of Florida, 156 Fla. 227, 22 So. 2d 875, which affirmed a judgment of guilt in contempt of the Circuit Court of Dade County, Florida, on a citation of petitioners by that Circuit Court.

The individual petitioner was the associate editor of the Miami Herald, a newspaper of general circulation, published in Dade County, Florida, and within the jurisdiction of the trial court. The corporate petitioner was the publisher of the Miami Herald. Together petitioners were responsible for the publication of two editorials charged by the citation to be contemptuous of the Circuit Court and its judges in that they were unlawfully critical of the administration of criminal justice in certain cases then pending before the Court.

Certiorari was granted to review petitioners' contention that the editorials did not present "a clear and present danger of high imminence to the administration of justice

by the court" or judges who were criticized and therefore the judgment of contempt was invalid as violative of the petitioners' right of free expression in the press. The importance of the issue in the administration of justice at this time, in view of this Court's decision in *Bridges* v. *California*, 314 U. S. 252, three years prior to this judgment in contempt, is apparent.

*Bridges* v. *California* fixed reasonably well-marked limits around the power of courts to punish newspapers and others for comments upon or criticism of pending litigation. The case placed orderly operation of courts as the primary and dominant requirement in the administration of justice. Pages 263, 265, 266. This essential right of the courts to be free of intimidation and coercion was held to be consonant with a recognition that freedom of the press must be allowed in the broadest scope compatible with the supremacy of order. A theoretical determinant of the limit for open discussion was adopted from experience with other adjustments of the conflict between freedom of expression and maintenance of order. This was the clear and present danger rule. The evil consequence of comment must be "extremely serious and the degree of imminence extremely high before utterances can be punished." Page 263. It was, of course, recognized that this formula, as would any other, inevitably had the vice of uncertainty, page 261, but it was expected that, from a decent self-restraint on the part of the press and from the formula's repeated application by the courts, standards of permissible comment would emerge which would guarantee the courts against interference and allow fair play to the good influences of open discussion. As a step toward the marking of the line, we held that the publications there involved were within the permissible limits of free discussion.

In the *Bridges* case the clear and present danger rule was applied to the stated issue of whether the expressions there

under consideration prevented "fair judicial trials free from coercion or intimidation." Page 259. There was, of course, no question as to the power to punish for disturbances and disorder in the court room. Page 266. The danger to be guarded against is the "substantive evil" sought to be prevented. Pages 261, 262, 263. In the *Bridges* case that "substantive evil" was primarily the "disorderly and unfair administration of justice." Pages 270, 271, 278.[1]

The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues. With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they were made to see whether or not they do carry a threat of clear and present danger to the impartiality and good order of the courts or whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.[2] When the highest court of a state has reached a determination upon such an issue, we give most respectful attention to its reasoning and conclusion but its authority is not final. Were it otherwise the constitutional limits of free expression in the Nation would vary with state lines.[3]

While there was a division of the Court in the *Bridges* case as to whether some of the public expressions by edi-

---

[1] Compare *Schenck* v. *United States*, 249 U. S. 47, 52; *Thornhill* v. *Alabama*, 310 U. S. 88, 105; *Carlson* v. *California*, 310 U. S. 106, 113; *Board of Education* v. *Barnette*, 319 U. S. 624, 633.

[2] *Gitlow* v. *New York*, 268 U. S. 652, 666; *Near* v. *Minnesota*, 283 U. S. 697, 707.

[3] *Bridges* v. *California*, 314 U. S. 252, 267. Compare *Chambers* v. *Florida*, 309 U. S. 227, 228; *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, 659.

torial comment transgressed the boundaries of a free press and as to the phrasing of the test, there was unanimous recognition that California's power to punish for contempt was limited by this Court's interpretation of the extent of protection afforded by the First Amendment. *Bridges* v. *California, supra,* at 297. Whether the threat to the impartial and orderly administration of justice must be a clear and present or a grave and immediate danger, a real and substantial threat, one which is close and direct or one which disturbs the court's sense of fairness depends upon a choice of words. Under any one of the phrases, reviewing courts are brought in cases of this type to appraise the comment on a balance between the desirability of free discussion and the necessity for fair adjudication, free from interruption of its processes.

The editorials of November 2d and 7th, 1944, which caused the court to issue the citation are set out below.[4]

---

[4] November 2, 1944:

*"Courts Are Established—*

For the People

"The courts belong to the people. The people have established them to promote justice, insure obedience to the law and to Punish Those Who Willfully Violate It.

"The people maintain the courts by providing the salaries of officials and setting up costly chambers and courtrooms for the orderly and dignified procedure of the tribunals.

"Upon the judges the people must depend for the decisions and the judicial conduct that will insure society—as a whole and in its individuals—against those who would undermine or destroy the peace, the morality and the orderly living of the community.

---

"In Order that the courts should not be amenable to political or other pressures in their determination of matters placed before them, Florida Circuit judges are called upon to face the electorate less often than are other elective office holders.

"So long are their terms, in fact, that in Dade county no Circuit judge, and only one judge of another court, has come to the bench by public choice in the first instance. All the others have been named

Accompanying the first editorial was a cartoon which held up the law to public obloquy. It caricatured a court by a robed compliant figure as a judge on the bench tossing

---

by a governor to fill a vacancy caused by death or resignation, or similar circumstance.

"Judicial terms in Dade county run:

1—Six years each for six Circuit judges.
2—Four years each for two Civil Court of Record judges.
3—Four years for the judge of the Criminal Court of Record.
4—Four years for the judge of the Court of Crimes.
5—Four years for County judge.
6—Four years for Juvenile court judge.

"These twelve judges represent the majesty and the sanctity of the law. They are the first line of defense locally of organized society against vice, corruption and crime, and the sinister machinations of the underworld.

---

"It Is beyond question that American courts are of, by and for the people.

"Every accused person has a right to his day in court. But when judicial instance and interpretative procedure recognize and accept, even go out to find, every possible technicality of the law to protect the defendant, to block, thwart, hinder, embarrass and nullify prosecution, then the people's rights are jeopardized and the basic reason for courts stultified.

"The seeming ease and pat facility with which the criminally charged have been given technical safeguard have set people to wondering whether their courts are being subverted into refuges for lawbreakers.

"This Week the people, through their grand jury, brought into court eight indictments for rape. Judge Paul D. Barns agreed with the defense that the indictments were not properly drawn. Back they went to the grand jury for re-presentation to the court.

"Only in the gravest emergency does a judge take over a case from another court of equal jurisdiction. A padlock action against the Brook Club was initiated last spring before Judge George E. Holt, who granted a temporary injunction.

"After five months, the case appeared Tuesday out of blue sky before Judge Marshall C. Wiseheart at the time State Attorney Stanley Milledge was engaged with the grand jury.

"Speedy decision was asked by defense counsel despite months of

aside formal charges to hand a document, marked "Defendant dismissed," to a powerful figure close at his left arm and of an intentionally drawn criminal type.   At the

---

stalling.   The State Attorney had to choose between the grand jury and Judge Wiseheart's court.

"The judge dismissed the injunction against the club and its operators.   The defense got delay when it wanted and prompt decision from the court when it profited it.

"On Oct. 10 Judge Holt had before him a suit by the state to abate a nuisance (bookmaking) at the Tepee Club.

"Five affidavits of persons who allegedly visited the premises for the purpose of placing bets were introduced by the state over the objection of the defendants.

"Judge Holt ruled them out, explaining in denying the injunction against the Tepee Club:

" 'The defendant cannot cross-examine an affidavit.   The court cannot determine who is testifying and whether belief can be placed upon such testimony . . .   The fact that such affidavits were taken before the State Attorney does not give them any additional weight or value.'

"This may be good law, exact judicial evaluation of the statutes. It is, however, the character of legal interpretation which causes people to raise questioning eyebrows and shake confused heads in futile wonderment.

---

"If Technicalities are to be the order and the way for the criminally charged either to avoid justice altogether or so to delay prosecution as to cripple it, then it behooves our courts and the legal profession to cut away the deadwood and the entanglements.

"Make it possible for the state's case, the people's case, to be seen with equal clarity of judicial vision as that accorded accused lawbreakers.   Otherwise technicalities and the courts make the law, no matter what the will of the people and of their legislators."

November 7, 1944:

*"Why People Wonder*

"Here is an example of why people wonder about the law's delays and obstructing technicalities operating to the disadvantage of the state—which is the people—in prosecutions.

"After stalling along for months, the defense in the padlock case against the Brook Club appeared before Judge Marshall C. Wiseheart

right of the bench, a futile individual, labeled "Public Interest" vainly protests.

The citation charges that the editorials

> "did reflect upon and impugn the integrity of said Court and the Judges thereof in imputing that the Judges of said Court 'do recognize and accept, even go out to find, every possible technicality of the law to protect the defendant, to block, thwart, hinder, embarrass and nullify prosecution,' which said acts by you tend to create a distrust for said court and the judges thereof in the minds of the people of this county and state and tend to prevent and prejudice a fair and impartial action of the said Court and the Judges thereof in respect to the said pending case[s]."

After setting out details of alleged willful withholding and suppression of the whole truth in the publications, the citation further charges that

> "you, by said cartoon and editorial, have caused to be represented unto the public that concerning the cases of (A) the eight indictments for rape, (B) the said Brook Club case, and (C) the Teepee Club case, that the Judges of this Court [had not] fairly and impartially heard and decided the matters in said editorial mentioned and have thereby represented unto the general public that notwithstanding the

for a decision. The State Attorney was working with the grand jury. The court knocked out the injunction. There was speed, dispatch, immediate attention and action for those charged with violation of the law. So fast that the people didn't get in a peep.

"That's one way of gumming up prosecution. Another is to delay action. On March 29, Coy L. Jaggears, bus driver, was sentenced to fifteen days in city jail by Judge Cecil C. Curry on conviction of beating up a taxicab operator.

"The arrest precipitated the notorious bus strike. As a result, Jaggears walked out of jail after posting a $200 appeal bond. The appeal never got further.

"There you have the legal paradox, working two ways, but to the same purpose against prosecution. Speed when needed. Month after month of delay when that serves the better."

> great public trust vested in the Judges of this Court that they have not discharged their duties honorably and fairly in respect to said pending cases as hereinbefore set forth, all of which tends to obstruct and interfere with the said Judges as such in fairly and impartially administering justice and in the discharging of their duties in conformity with the true principles which you have so properly recognized in the forepart of said editorial above quoted as being incumbent upon them and each of them; . . ."

Petitioners were required to show cause why they should not be held in contempt.

Petitioners answered that the publications were legitimate criticism and comment within the federal guaranties of free press and created no clear and present danger to the administration of justice. They sought to justify the publications by stating in their return to the rule that the facts stated in the editorials were correct, that two of the cases used as examples were not pending when the comments were made, since orders of dismissal had been previously entered by the Circuit Court, and that they as editors

> "had the right if not the duty openly and forcefully to discuss these conditions to the end that these evils that are profoundly disturbing to the citizens of this county, might be remedied. The publications complained of did nothing more than discuss the generally recognized weakness and breakdown in the system of law enforcement and call for its improvement."

It is not practicable to comment at length on each of the challenged items. To make our decision as clear as possible, we shall refer in detail only to the comments concerning the "Rape Cases." These we think fairly illustrate the issues and are the most difficult comments for the petitioners to defend.

As to these cases, the editorial said:

> "This Week the people, through their grand jury, brought into court eight indictments for rape. Judge Paul D. Barns agreed with the defense that the indictments were not properly drawn. Back they went to the grand jury for re-presentation to the court."

We shall assume that the statement, "judicial instance and interpretative procedure . . . even go out to find, every possible technicality of the law to protect the defendant . . . and nullify prosecution," refers to the quashing of the rape indictments as well as other condemned steps. The comment of the last two paragraphs evidently includes these dismissals as so-called legal technicalities. See Note 4.

The citation charged that the prosecuting officer in open court agreed that the indictments were so defective as to make reindictment advisable. Reindictments were returned the next day and before the editorial. It was charged that these omissions were a wanton withholding of the full truth.

As to this charge, the petitioners made this return:

> "That as averred in the citation, a motion was made to quash the indictment in Case 856, the ruling upon which would control in the other cases mentioned. Whereupon the representative of the State Attorney's Office stated in effect that he believed the original indictment was in proper form, but to eliminate any question he would have these defendants immediately re-indicted by the Grand Jury which was still then in session. And thereupon, the Judge of said Court did sustain the motion to quash with respect to Case No. 856."

The record of the Criminal Division of the Circuit Court, set out in the findings of fact at the hearing on the citation in contempt, shows that in case No. 856 the court upheld the defendants' motion to quash "with the ap-

proval of the Assistant State Attorney" and quashed the remaining indictments on his recommendation. Reindictment of the accused on the next day, prompt arraignment and setting for trial also appears. We accept the record as conclusive of the facts.

We read the Circuit Court's judgment to find that the comment on the Rape Cases contained only "half-truths," that it did not "fairly report the proceedings" of the court, that it contained "misinformation." The judgment said:

> "To report on court proceedings is a voluntary undertaking but when undertaken the publisher who fails to fairly report does so at his own peril.
>
> .    .    .    .    .
>
> "We find the facts recited and the charges made in the citation to be true and well founded; . . ."

This finding included the fact that reindictments were then pending in the Rape Cases. Defendants' assignments of error challenged the ruling that the matters referred to in the editorials were pending and the Supreme Court of Florida ruled that the cases were pending. 156 Fla. at 241, 22 So. 2d at 883:

> "We also agree that publications about a case that is closed no matter how scandalous, are not punishable as contempt. This is the general rule but the Florida Statute is more liberal than the rule."

Cf. Florida Statutes 1941, § 38.23 and § 932.03; see also 156 Fla. at 248, 249, 22 So. 2d at 886.

In *Bridges* v. *California,* 314 U. S. 252, 271–78, dissent 297–302, this Court looked upon cases as pending following completed interlocutory actions of the courts but awaiting other steps. In one instance it was sentence after verdict. In another, a motion for a new trial.

Pennekamp was fined $250 and the corporation, $1,000.00.

The Supreme Court of Florida restated the facts as to the Rape Cases from the record. 156 Fla. at 238, 22 So.

2d at 881. It then reached a conclusion as to all of the charges and so as to the Rape Cases in the words set out below.[5] After further discussion of the facts, the Court said, 156 Fla. at 241, 22 So. 2d at 883:

> "In the light of this factual recitation, it is utter folly to suggest that the object of these publications was other than to abase and destroy the efficiency of the court."

To focus attention on the critical issue, we quote below from the decision of the Supreme Court of Florida certain excerpts which we believe fairly illustrate its position as to the applicable law.[6]

---

[5] 156 Fla. 227, 239, 240, 22 So. 2d 875, 882:

"So the vice in both the editorials was the distorted, inaccurate statement of the facts and with that statement were scrambled false insinuations that amounted to unwarranted charges of partisanship and unfairness on the part of the judges.

"The record was available in all these cases and it does not reveal a breath of suspicion on which to predicate partisanship and unfairness on the part of the judges. It is shown rather that they acted in good faith and handled each case to the very best advantage possible. There was no judgment that could have been entered in any of them except the one that was entered. If the editorials had stated the facts correctly, nothing but a correct conclusion could have been deduced and there would have been no basis for contempt but here they elected to publish as truth a mixture of factual misstatement and omission and impose on that false insinuation, distortion, and deception and then contend that freedom of the press immunizes them from punishment."

[6] 156 Fla. 227, 244–249, 22 So. 2d 875, 884–886:

"A newspaper may criticize, harass, irritate, or vent its spleen against a person who holds the office of judge in the same manner that it does a member of the Legislature and other elective officers, but it may not publish scurrilous or libelous criticisms of a presiding judge as such or his judgments for the purpose of discrediting the Court in the eyes of the public. Respect for courts is not inspired by shielding them from criticism. This is a responsibility of the judge, acquired over the years by the spirit in which he approaches the judicial process, his ability to humanize the law and square it with reason, the level

**344**

From the editorials, the explanations of the petitioners and the records of the court, it is clear that the full truth in regard to the quashing of the indictments was not published. We agree with the Supreme Court that the Rape

of his thinking, the consistency of his adherence to right and justice, and the degree to which he holds himself aloof from blocs, groups, and techniques that would sacrifice justice for expediency."

"Courts cannot function in a free country when the atmosphere is charged with the effusions of a press designed to poison the mind of the public against the presiding judges rather than to clarify the issues and propagate the truth about them. The latter was the press that Mr. Jefferson visioned when he promulgated the thesis, 'Our liberty depends on the freedom of the press and that cannot be limited without being lost.'"

"Freedom to publish one's views is a principle of universal practice, but when the press deliberately abandons the proprieties and sets out to poison its pabulum or to sow dragons' teeth and dispense canards for the purpose of doing another a wrong, it is no different category from a free man that does likewise. The most rigid safeguard thrown around a free press would not protect appellants from falsely publishing or announcing to the world that the clergy of Miami were in sympathy with the practice of polygamy or were fostering other doctrines equally obnoxious to approved moral standards."

"The theory of our system of fair trial is that the determination of every case should be induced solely by evidence and argument in open court and the law applicable thereto and not by any outside influence, whether of private talk or public print."

"The State Courts touch the public much more frequently than the Federal Courts and they have many reasons to enforce orderly administration that would not arise in the Federal Courts. If that power is to be construed by what appellants contend to be the pattern in the Bridges and Nye cases, then more than one hundred years of state law and decisions on the subject are turned into confusion or set at naught. . . .

"We do not think this can be the law. The Bridges case was disposed of on authority of the ' "clear and present danger" cases,' which are not analogous to most of the state cases because they arise from a different state of the law. The ultimate test in the Bridges case requires that the 'substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.' Even if this test is to [be] the rule in the State Courts, they

Cases were pending at the time of the editorials. We agree that the editorials did not state objectively the attitude of the judges. We accept the statement of the Supreme Court that under Florida law, "There was no judgment that could have been entered in any of them except the one that was entered." 156 Fla. at 240, 22 So. 2d at 882. And, although we may feel that this record scarcely justifies the harsh inference that the truth was willfully or wantonly or recklessly withheld from the public or that the motive behind the publication was to abase and destroy the efficiency of the courts, we may accept in this case that conclusion of the Florida courts upon intent and motive as a determination of fact.[7] While the ultimate power is here to ransack the record for facts in constitutional controversies, we are accustomed to adopt the result of the state court's examination.[8] It is the findings of the state courts on undisputed facts or the undisputed facts themselves which ordinarily furnish the basis for our appraisal of claimed violations of federal constitutional rights.[9]

The acceptance of the conclusion of a state court as to the facts of a situation leaves open to this Court the determination of federal constitutional rights in the setting of

are authorized to apply it by their own law and standards and unless the application is shown to be arbitrary and unreasonable, their judgment should not be disturbed. The law in Florida permits the most liberal exercise possible of freedom of the press but holds to account, those who abuse it.

"We therefore hold that the cartoon and the editorials afford ample support for the judgment imposed and that the issues were properly adjudicated under Florida law."

[7] See IX Wigmore, Evidence (3d Ed.) § 2557. *Crawford* v. *United States,* 212 U. S. 183, 203.

[8] *Drivers Union* v. *Meadowmoor Co.,* 312 U. S. 287, 293–94; *Lisenba* v. *California,* 314 U. S. 219, 238.

[9] *Chambers* v. *Florida,* 309 U. S. 227, 239; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 152, 153, 154; *Malinski* v. *New York,* 324 U. S. 401, 404.

those facts.[10]   When the *Bridges* case was here, there was necessarily involved a determination by the California state court that all of the editorials had, at least, a tendency to interfere with the fair administration of criminal justice in pending cases in a court of that state.   Yet this Court was unanimous in saying that two of those editorials had no such impact upon a court as to justify a conviction of contempt in the face of the principles of the First Amendment.   We must, therefore, weigh the right of free speech which is claimed by the petitioners against the danger of the coercion and intimidation of courts in the factual situation presented by this record.

Free discussion of the problems of society is a cardinal principle of Americanism—a principle which all are zealous to preserve.[11]   Discussion that follows the termination of a case may be inadequate to emphasize the danger to public welfare of supposedly wrongful judicial conduct.[12] It does not follow that public comment of every character upon pending trials or legal proceedings may be as free as a similar comment after complete disposal of the litigation.   Between the extremes there are areas of discussion which an understanding writer will appraise in the

---

[10] See the cases in the preceding paragraph, note 8.

[11] *Murdock* v. *Pennsylvania*, 319 U. S. 105, 115; *Board of Education* v. *Barnette*, 319 U. S. 624, 639; *Thomas* v. *Collins*, 323 U. S. 516, 527, 530.

[12] *Bridges* v. *California*, 314 U. S. at 269:

"No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression.   Yet, it would follow as a practical result of the decisions below that anyone who might wish to give public expression to his views on a pending case involving no matter what problem of public interest, just at the time his audience would be most receptive, would be as effectively discouraged as if a deliberate statutory scheme of censorship had been adopted."

light of the effect on himself and on the public of creating a clear and present danger to fair and orderly judicial administration. Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.

While a disclaimer of intention does not purge a contempt, we may at this point call attention to the sworn answer of petitioners that their purpose was not to influence the court. An excerpt appears below.[13] For circumstances to create a clear and present danger to judicial administration, a solidity of evidence should be required which it would be difficult to find in this record. Com-

---

[13] "These respondents deny any intent by either said editorial or said cartoon either in words or otherwise to interfere with fair and impartial justice in the State of Florida and deny that the large character in the cartoon was beside the judge and on the bench and being heard, recognized and favored, but, on the contrary, these respondents respectfully show that it was the intention of said editorial and said cartoon to condemn and criticise the system of pleading and practice and procedure created by the laws of Florida, whereby such cases could long be delayed and then could be dismissed upon technical grounds in the manner herein shown."

We add Mr. Pennekamp's statement of the editorial policy of the Miami Herald:

" 'We are ourselves Free—Free as the Constitution we enjoy—Free to truth, good manners and good sense. We shall be for whatever measure is best adapted to defending the rights and liberties of the people and advancing useful knowledge. We shall labor at all times to inspire the people with a just and proper sense of their condition, to point out to them their true interest and rouse them to pursue it.' "

pare *Baumgartner* v. *United States,* 322 U. S. 665, 670; *Schneiderman* v. *United States,* 320 U. S. 118.

The comments were made about judges of courts of general jurisdiction—judges selected by the people of a populous and educated community. They concerned the attitude of the judges toward those who were charged with crime, not comments on evidence or rulings during a jury trial. Their effect on juries that might eventually try the alleged offenders against the criminal laws of Florida is too remote for discussion. Comment on pending cases may affect judges differently. It may influence some judges more than others. Some are of a more sensitive fiber than their colleagues. The law deals in generalities and external standards and cannot depend on the varying degrees of moral courage or stability in the face of criticism which individual judges may possess any more than it generally can depend on the personal equations or individual idiosyncrasies of the tort-feasor. *The Germanic,* 196 U. S. 589, 596; *Arizona Employers' Liability Cases,* 250 U. S. 400, 422, 432. We are not willing to say under the circumstances of this case that these editorials are a clear and present danger to the fair administration of justice in Florida. Cf. *Near* v. *Minnesota,* 283 U. S. 697, 714–15.

What is meant by clear and present danger to a fair administration of justice? No definition could give an answer. Certainly this criticism of the judges' inclinations or actions in these pending non-jury proceedings could not directly affect such administration. This criticism of their actions could not affect their ability to decide the issues. Here there is only criticism of judicial action already taken, although the cases were still pending on other points or might be revived by rehearings. For such injuries, when the statements amount to defamation, a

judge has such remedy in damages for libel as do other public servants.

It is suggested, however, that even though his intellectual processes cannot be affected by reflections on his purposes, a judge may be influenced by a desire to placate the accusing newspaper to retain public esteem and secure reelection presumably at the cost of unfair rulings against an accused. In this case too many fine-drawn assumptions against the independence of judicial action must be made to call such a possibility a clear and present danger to justice. For this to follow, there must be a judge of less than ordinary fortitude without friends or support or a powerful and vindictive newspaper bent upon a rule or ruin policy, and a public unconcerned with or uninterested in the truth or the protection of their judicial institutions. If, as the Florida courts have held and as we have assumed, the petitioners deliberately distorted the facts to abase and destroy the efficiency of the court, those misrepresentations with the indicated motives manifested themselves in the language employed by petitioners in their editorials. The Florida courts see in this objectionable language an open effort to use purposely the power of the press to destroy without reason the reputation of judges and the competence of courts. This is the clear and present danger they fear to justice. Although we realize that we do not have the same close relations with the people of Florida that are enjoyed by the Florida courts, we have no doubt that Floridians in general would react to these editorials in substantially the same way as citizens of other parts of our common country.

As we have pointed out, we must weigh the impact of the words against the protection given by the principles of the First Amendment, as adopted by the Fourteenth, to public comment on pending court cases. We conclude

that the danger under this record to fair judicial administration has not the clearness and immediacy necessary to close the door of permissible public comment. When that door is closed, it closes all doors behind it.

*Reversed.*

Mr. Justice Jackson took no part in the consideration or decision of this case.

Mr. Justice Frankfurter, concurring.

On the basis of two editorials and a cartoon, the Circuit Court of Florida for the County of Dade found the publisher of the Miami *Herald* and one of its editors guilty of contempt of court.[1] The editor, Pennekamp, was fined $250 and the Publishing Company, $1,000. Deeming *Bridges* v. *California*, 314 U. S. 252, not controlling, the Supreme Court of Florida, with two judges dissenting, sustained the convictions. 156 Fla. 227, 22 So. 2d 875.

In the *Bridges* case this Court recently canvassed constitutional aspects of contempt of court by publication. But it was hardly to be expected that other problems in the large field within which the *Bridges* case moved would not recur. This Court sits to interpret, in appropriate judicial controversies, a Constitution which in its Bill of Rights formulates the conditions of a democracy. But democracy is the least static form of society. Its basis

---

[1] The judges who tried the contempt cases were the same judges who were criticized by the editorials. The words of caution of Mr. Chief Justice Taft become relevant: "The delicacy there is in the judge's deciding whether an attack upon his own judicial action is mere criticism or real obstruction, and the possibility that impulse may incline his view to personal vindication, are manifest." *Craig* v. *Hecht*, 263 U. S. 255, 279 (concurring). But the judges who tried petitioners were sensible of the delicacy of their position, and offered to retire from the case if petitioners felt they would prefer to be tried by another judge.

is reason not authority. Formulas embodying vague and uncritical generalizations offer tempting opportunities to evade the need for continuous thought. But so long as men want freedom they resist this temptation. Such formulas are most beguiling and most mischievous when contending claims are those not of right and wrong but of two rights, each highly important to the well-being of society. Seldom is there available a pat formula that adequately analyzes such a problem, least of all solves it. Certainly no such formula furnishes a ready answer to the question now here for decision or even exposes its true elements. The precise issue is whether, and to what extent, a State can protect the administration of justice by authorizing prompt punishment, without the intervention of a jury, of publications out of court that may interfere with a court's disposition of pending litigation.

The decision in the *Bridges* case did not explicitly deny to the States the right to protect the judicial process from interference by means of a publication bearing on a pending litigation. The atmosphere and emanations of the Court's opinion, however, were calculated to sanction anything to be said or written outside the courtroom even though it may hurt or embarrass the just outcome of a proceeding. But in a series of decisions which presented most sharply the constitutional extent of freedom of speech, this Court had held that the Constitution did not allow absolute freedom of expression—a freedom unrestricted by the duty to respect other needs fulfillment of which makes for the dignity and security of man. *Schenck* v. *United States,* 249 U. S. 47; *Frohwerk* v. *United States,* 249 U. S. 204; *Debs* v. *United States,* 249 U. S. 211.

No Justice thought more deeply about the nature of a free society or was more zealous to safeguard its conditions by the most abundant regard for civil liberty than Mr. Justice Holmes. He left no doubt that judicial protection

of freedom of utterance is necessarily qualified by the requirements of the Constitution as an entirety for the maintenance of a free society. It does an ill-service to the author of the most quoted judicial phrases regarding freedom of speech, to make him the victim of a tendency which he fought all his life, whereby phrases are made to do service for critical analysis by being turned into dogma. "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." Holmes, J., dissenting, in *Hyde* v. *United States*, 225 U. S. 347, 384, at 391. Words which "are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent," *Schenck* v. *United States*, 249 U. S. 47, 52, speak their own condemnation. But it does violence to the juristic philosophy and the judicial practice of Mr. Justice Holmes to assume that in using the phrase "a clear and present danger" he was expressing even remotely an absolutist test or had in mind a danger in the abstract. He followed the observation just quoted by the emphatic statement that the question is one "of proximity and degree," as he conceived to be most questions in connection with the large, undefined rights guaranteed by the Constitution. And Mr. Justice Brandeis, co-architect of the great constitutional structure of civil liberties, also recognized that "the permissible curtailment of free speech is . . . one of degree. And because it is a question of degree the field in which the jury may exercise its judgment is, necessarily, a wide one." *Schaefer* v. *United States*, 251 U. S. 466, 482, at 483 (dissenting). If Mr. Justice Brandeis' constitutional philosophy means anything, it is clear beyond peradventure that he would not deny to a State, exercising its judgment as to the mode by which speech may be curtailed by punishment

subsequent to its utterance, a field less wide than that which he permitted a jury in a federal court.

"Clear and present danger" was never used by Mr. Justice Holmes to express a technical legal doctrine or to convey a formula for adjudicating cases. It was a literary phrase not to be distorted by being taken from its context. In its setting it served to indicate the importance of freedom of speech to a free society but also to emphasize that its exercise must be compatible with the preservation of other freedoms essential to a democracy and guaranteed by our Constitution. When those other attributes of a democracy are threatened by speech, the Constitution does not deny power to the States to curb it. "The clear and present danger" to be arrested may be danger short of a threat as comprehensive and vague as a threat to the safety of the Republic or "the American way of life." Neither Mr. Justice Holmes nor Mr. Justice Brandeis nor this Court ever suggested in all the cases that arose in connection with the First World War, that only imminent threats to the immediate security of the country would authorize courts to sustain legislation curtailing utterance. Such forces of destruction are of an order of magnitude which courts are hardly designed to counter. "The clear and present danger" with which its two great judicial exponents were concerned was a clear and present danger that utterance "would bring about the evil which Congress sought and had a right to prevent." *Schaefer v. United States, supra.* Among "the substantive evils" with which legislation may deal is the hampering of a court in a pending controversy, because the fair administration of justice is one of the chief tests of a true democracy. And since men equally devoted to the vital importance of freedom of speech may fairly differ in an estimate of this danger in a particular case, the field in which a State "may exercise its judgment is, necessarily, a wide one." Therefore,

every time a situation like the present one comes here the precise problem before us is to determine whether the State court went beyond the allowable limits of judgment in holding that conduct which has been punished as a contempt was reasonably calculated to endanger a State's duty to administer impartial justice in a pending controversy.

Without a free press there can be no free society.[2]  Freedom of the press, however, is not an end in itself but a

---

[2] ". . . the administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities.  The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct.  Subsequent punishment for such abuses as may exist is the appropriate remedy, consistent with constitutional privilege." *Near* v. *Minnesota*, 283 U. S. 697, 719-20.

Not unrelated to this whole problem, however, are the technological and economic influences that have vastly transformed the actual operation of the right to a free, in the sense of a governmentally uncensored, press.  Bigness and concentration of interest have put their impress also on this industry.  "Today ideas are still flowing freely, but the sources from which they rise have shown a tendency to evaporate. . . .  The controlling fact in the free flow of thought is not diversity of opinion, it is diversity of the *sources* of opinion—that is, diversity of ownership. . . .  There are probably a lot more words written and spoken in America today than ever before, and on more subjects; but if it is true, as this book suggests, that these words and ideas are flowing through fewer channels, then our first freedom has been diminished, not enlarged." E. B. White, in the New Yorker, March 16, 1946, p. 97, reviewing Ernst, *The First Freedom* (1946).  There are today incomparably more effective and more widespread means for the dissemination of ideas and information than in the past.  But a steady shrinkage of a diffused ownership raises far reaching questions regarding the meaning of the "freedom" of a free press.

means to the end of a free society. The scope and nature of the constitutional protection of freedom of speech must be viewed in that light and in that light applied. The independence of the judiciary is no less a means to the end of a free society, and the proper functioning of an independent judiciary puts the freedom of the press in its proper perspective. For the judiciary cannot function properly if what the press does is reasonably calculated to disturb the judicial judgment in its duty and capacity to act solely on the basis of what is before the court. A judiciary is not independent unless courts of justice are enabled to administer law by absence of pressure from without, whether exerted through the blandishments of reward or the menace of disfavor. In the noble words, penned by John Adams, of the First Constitution of Massachusetts: "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial, and independent as the lot of humanity will admit." [3] A free press is not to be preferred to an independent judiciary, nor an independent judiciary to a free press. Neither has primacy over the other; both are indispensable to a free society. The freedom of the press in itself presupposes an independent judiciary through which that freedom may, if necessary, be vindicated. And one of the potent means for assuring judges their independence is a free press.

A free press is vital to a democratic society because its freedom gives it power. Power in a democracy implies responsibility in its exercise. No institution in a democracy, either governmental or private, can have absolute

---

[3] Article XXIX of the Declaration of Rights of the Constitution of Massachusetts, 1780.

power.[4]  Nor can the limits of power which enforce responsibility be finally determined by the limited power itself.  See Carl L. Becker, *Freedom and Responsibility in the American Way of Life* (1945).  In plain English, freedom carries with it responsibility even for the press; freedom of the press is not a freedom from responsibility for its exercise.  Most State constitutions expressly provide for liability for abuse of the press's freedom.  That there was such legal liability was so taken for granted by the framers of the First Amendment that it was not spelled out.  Responsibility for its abuse was imbedded in the law.[5]  The First Amendment safeguarded the right.

These are generalities.  But they are generalities of the most practical importance in achieving a proper adjustment between a free press and an independent judiciary.

Especially in the administration of the criminal law— that most awesome aspect of government—society needs independent courts of justice.  This means judges free from control by the executive, free from all ties with political interests, free from all fears of reprisal or hopes of

---

[4] That this indispensable condition for a free society was well known to the framers of the Constitution, is the theme of Mr. Justice Brandeis in his dissenting opinion in *Myers* v. *United States*, 272 U. S. 52, 240, at 293: "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power.  The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy."  And see Mr. Chief Justice Taft, in *Ex parte Grossman*, 267 U. S. 87, 119–22.

[5] The State constitutions make it clear that the freedom of speech and press they guarantee is not absolute.  All, with the exception only of Massachusetts, New Hampshire, South Carolina, Vermont, and West Virginia, explicitly provide in practically identical language for the right to speak, write and publish freely, every one, however, "being responsible for the abuse of that right."

reward. The safety of society and the security of the innocent alike depend upon wise and impartial criminal justice. Misuse of its machinery may undermine the safety of the State; its misuse may deprive the individual of all that makes a free man's life dear.[6]

Criticism therefore must not feel cramped, even criticism of the administration of criminal justice. Weak characters ought not to be judges, and the scope allowed to the press for society's sake may assume that they are not. No judge fit to be one is likely to be influenced consciously except by what he sees and hears in court and by what is judicially appropriate for his deliberations. However, judges are also human, and we know better than did our forbears how powerful is the pull of the unconscious and how treacherous the rational process. While the ramparts of reason have been found to be more fragile than the Age of Enlightenment had supposed, the means for arousing passion and confusing judgment have been reinforced. And since judges, however stalwart, are human, the delicate task of administering justice ought not to be made unduly difficult by irresponsible print.

The English bench is justly noted for its sturdiness, and it was no weak-kneed judge who recently analyzed the mis-

---

[6] See, *e. g.*, the disturbing record in the case of Campbell, New York County Criminal Courts Bar Association, *In the Matter of the Investigation of the Conviction of Bertram M. Campbell* (Feb. 22, 1946), and the decision of the New York Court of Claims, on June 17, 1946, awarding Campbell $115,000 for wrongful conviction, including damages for loss of earnings, after his pardon by Governor Dewey following the confession by another of the crimes for which Campbell had been convicted. "He was the victim of a miscarriage of justice but fortunately for him the State has undertaken to rectify the mistake as far as possible. . . . Seven years, six months and five days elapsed from claimant's arrest until he was pardoned." *Campbell* v. *New York*, 186 Misc. 586, 591.

chief of exposing even the hardiest nature to extraneous influence: ". . . I think it is a fallacy to say or to assume that the presiding judge is a person who cannot be affected by outside information. He is a human being, and while I do not suggest that it is likely that any judge, as the result of information which had been improperly conveyed to him, would give a decision which otherwise he would not have given, it is embarrassing to a judge that he should be informed of matters which he would much rather not hear and which make it much more difficult for him to do his duty. To repeat the words I have already read from the judgment of Wills J. in *Rex* v. *Parke* [(1903) 2 K. B. 432]. 'The reason why the publication of articles like those with which we have to deal is treated as a contempt of court is because their tendency and sometimes their object is to deprive the court of the power of doing that which is the end for which it exists—namely, to administer justice duly, impartially, and with reference solely to the facts judicially brought before it.' . . . I venture to think that no judge with long criminal experience will fail to be able to recall instances in which the publication of matters such as that to which I have referred has had the effect of making the task of a judge extremely difficult, and no one has the right to publish matter which will have that effect." Humphreys, J., in *Rex* v. *Davies,* [1945] 1 K. B. 435, 442–43. The observations of another judge in the same case bear quoting: ". . . jurors are not the only people whose minds can be affected by prejudice. One of the evils of inadmissible matter being disseminated is that no one can tell what effect a particular piece of information may have on his mind. Why, as my Lord has asked, and I can think of no better word, should a judge be 'embarrassed' by having matters put into his mind, the effect of which it is impossible to estimate or assess? As an illustration of this proposition, the Court of Criminal

Appeal has expressed, not once but many times, its thorough disapproval of evidence which is sometimes given by police officers at the end of a case when a man has been convicted. On such occasions all sorts of allegations are frequently made against a man's character, sometimes in the nature of hearsay and sometimes not supported by evidence at all. What is the ground for the disapproval of the Court of Criminal Appeal regarding such statements? It can only be that the judge who, after hearing the statements, has to pronounce sentence, may, quite unconsciously, have his judgment influenced by matters which he has no right to consider. . . . Not all defamatory matter can amount to contempt of court. . . . Whether defamatory matter amounts to contempt in any particular case is a question in each case of fact, of degree and of circumstances." Oliver, J., in *Rex* v. *Davies, supra,* at 445–46. *Cf. Parashuram Detaram Shamdasani* v. *King-Emperor,* [1945] A. C. 264. To deny that bludgeoning or poisonous comment has power to influence, or at least to disturb, the task of judging is to play make-believe and to assume that men in gowns are angels. The psychological aspects of this problem become particularly pertinent in the case of elected judges with short tenure.

"Trial by newspaper," like all catch phrases, may be loosely used but it summarizes an evil influence upon the administration of criminal justice in this country. Its absence in England, at least its narrow confinement there, furnishes an illuminating commentary. It will hardly be claimed that the press is less free in England than in the United States. Nor will any informed person deny that the administration of criminal justice is more effective there than here. This is so despite the commonly accepted view that English standards of criminal justice are more civilized, or, at the least, that recognized standards of fair conduct in the prosecution of crime are better ob-

served. Thus, "the third degree" is not unjustly called "the American method." [7] This is not the occasion to enlarge upon the reasons for the greater effectiveness of English criminal justice but it may be confidently asserted that it is more effective partly because its standards are so civilized.[8] There are those who will resent such a statement as praise of another country and dispraise of one's

[7] Compare *Inquiry in Regard to the Interrogation by the Police of Miss Savidge,* Cmd. 3147 (1928); *Report of the Royal Commission on Police Powers and Procedure,* Cmd. 3297 (1929), with *Report on Lawlessness in Law Enforcement,* in 4 National Commission on Law Observance and Enforcement Reports (1931). See also *Wan* v. *United States,* 266 U. S. 1; *Brown* v. *Mississippi,* 297 U. S. 278; *Chambers* v. *Florida,* 309 U. S. 227.

[8] The recent ruling by the Speaker of the House of Commons regarding the limitation on the right to comment even in Parliament on the pending proceedings against the accused Nazis before the Nuremberg tribunal bears significantly on the attitude and controlling standards deemed appropriate in England in order to protect the judicial process from extraneous influences:

"The Rule to which the Noble Lord has drawn my attention that reflections cannot be made on judges of the High Court and certain other courts, except by way of a substantive Motion, applies only to the courts of this country. In terms, therefore, it only covers the two British members of this tribunal. I feel that it would be worse than invidious—indeed improper—not to extend the same protection to their colleagues on this tribunal who represent the three other Allied Nations.

"There is, however, another of our Rules of Debate which is relevant to this case, the Rule that matters which are *sub judice* should not be the subject of discussion in this House. This Rule again, in terms, applies only to British courts. The court in Nuremberg is a court in which British judges participate, and we have the same interest in seeing that nothing is done here to disturb its judicial atmosphere as we have in the case of British courts—indeed, perhaps a greater interest, since the eyes of the world are upon this new and difficult procedure of international justice, and the consequences of ill-advised interference might be incalculably mischievous.

"I think that the intention of both the Rules to which I have referred, is to preserve the House from even the appearance of inter-

own. What it really means is that one covets for his own country a quality of public conduct not surpassed elsewhere.

Certain features of American criminal justice have long been diagnosed by those best qualified to judge as serious and remediable defects. On the other hand, some mischievous accompaniments of our system have been so pervasive that they are too often regarded as part of the exuberant American spirit. Thus, "trial by newspapers" has sometimes been explained as a concession to our peculiar interest in criminal trials. Such interest might be an innocent enough pastime were it not for the fact that the stimulation of such curiosity by the press and the response to such stimulated interest have not failed to cause grievous tragedies committed under the forms of law. Of course trials must be public and the public have a deep interest in trials. The public's legitimate interest, however, precludes distortion of what goes on inside the courtroom, dissemination of matters that do not come before the court, or other trafficking with truth intended to influence proceedings or inevitably calculated to disturb the course of justice. The atmosphere in a courtroom may be subtly influenced from without.[9] See dissenting

---

fering in the administration of British justice—and this should include trials for which this country has some responsibility; and I rule, therefore, that all the members of this International Court are protected to the same extent as British judges, and that discussion of its proceedings is out of Order, in the same way as matters under adjudication in a British court of law." 416 Parliamentary Debates (Hansard) 599–600, Nov. 22, 1945.

[9] The manner in which the Hauptmann trial was reported led to a searching inquiry by a special committee of the American Bar Association and it reported the following recommendations:

"In the foregoing report we have tried to make a fair presentation of salient facts. We have been moved less by spirit of censure than by hope of remedial action. The excesses we have described differ from practices in many other cases mainly in degree.

"The trial of a criminal case is a business that has for its sole purpose

opinion of Mr. Justice Holmes, in *Frank* v. *Mangum,* 237 U. S. 309, 345, at 349.   Cases are too often tried in news-

the administration of justice, and it should be carried on without distracting influences.

"Passing from the general to the specific we recommend:

"That attendance in the courtroom during the progress of a criminal trial be limited to the seating capacity of the room.

"That the process of subpoena or any other process of the court should never be used to secure preferential admission of any person or spectator; that such abuse of process be punished as contempt.

"That approaches to the courtroom be kept clear, to the end that free access to the courtroom be maintained.

"That no use of cameras or photographic appliances be permitted in the courtroom, either during the session of the court or otherwise.

"That no sound registering devices for publicity use be permitted to operate in the courtroom at any time.

"That the surreptitious procurement of pictures or sound records be considered contempt of court and be punished as such.

"That the courtroom and the court house be kept free from news distributing devices and equipment.

"That newspaper accounts of criminal proceedings be limited to accounts of occurrences in court without argument of the case to the public.

"That no popular referendum be taken during the pendency of the litigation as to the guilt or innocence of the accused.

"That broadcasting of arguments, giving out of argumentive press bulletins, and every other form of argument or discussion addressed to the public, by lawyers in the case during the progress of the litigation be definitely forbidden.

"That bulletins by the defendant issued to the public during the progress of the trial be definitely forbidden.

"That public criticism of the court or jury by lawyers in the case during the progress of the litigation be not tolerated.

"That featuring in vaudeville of jurors or other court officers, either during or after the trial, be forbidden.

"That the giving of paid interviews or the writing of paid articles by jurors, either during or after the trial, be forbidden.

"That the atmosphere of the courtroom and adjacent premises be maintained as one of dignity and calm."   (1936) 22 *A. B. A. Journal* 79–80.

papers before they are tried in court, and the cast of characters in the newspaper trial too often differs greatly from the real persons who appear at the trial in court and who may have to suffer its distorted consequences.[10]

Newspapers and newspaper men themselves have acknowledged these practices, deplored their evils, and urged reform.[11] See The Attorney General's Conference on Crime (1934) 82–111. One of the most zealous claimants of the prerogatives of the press, the Chicago *Tribune,* has even proposed legal means for the correction of these in-

[10] See, *e. g.,* Gilman, *The Truth Behind the News* (June, 1933) 29 American Mercury 139. "It is idle for such newspapers to claim that they adopt such practices in the public interest. Their motive is the sordid one of increasing their profits, unmindful of the result to the unfortunate wretch who may ultimately have to stand his trial for murder." Mr. Justice Blair, in *Attorney-General* v. *Tonks* [1934] N. Z. L. R. 141, 148, at 150. *Cf.* Pratt, *How the Censors Rigged the News* (Feb., 1946) 192 Harper's Magazine, 97, 105.

[11] A professional defense of crime reporting has this bit of refreshing candor: "I will concede, however, that had it not been for popular feeling developed to fever heat by the newspapers, Hickman might be living today behind the walls of some madhouse instead of having met death in the electric chair." Dewey, *Crime and the Press* (Dec. 30, 1931) 15 Commonweal 231, 233. Compare the statement by one of the most experienced criminal lawyers, Clarence Darrow:

"Trial by jury is rapidly being destroyed in America by the manner in which the newspapers handle all sensational cases. I don't know what should be done about it. The truth is that the courts and the lawyers don't like to proceed against newspapers. They are too powerful. As the law stands today there is no important criminal case where the newspapers are not guilty of contempt of court day after day. All lawyers know it, all judges know it, and all newspapers know it. But nothing is done about it. No new laws are necessary. The court has full jurisdiction to see that no one influences a verdict or a decision. But everyone is afraid to act." Quoted by Perry, in *The Courts, the Press, and the Public (Trial by Newspaper)* (1931) 30 Mich. L. Rev. 228, 234; (1932) 66 U. S. Law Rev. 374, 379; (1932) 11 Phil. L. J. 277, 282.

roads upon the province of criminal justice: " 'The Tribune advocates and will accept drastic restriction of this preliminary publicity. The penetration of the police system and the courts by journalists must stop. With such a law there would be no motivation for it. Though such a law will be revolutionary in American journalism, though it is not financially advisable for newspapers, it still is necessary. Restrictions must come.' " [12]

It is not for me to express approval of these views, still less, judgment on the constitutional issues that would arise if they were translated into legislation. But they are relevant to an understanding of the nature of our problem. They serve also to emphasize that the purpose of the Constitution was not to erect the press into a privileged institution but to protect all persons in their right to print what they will as well as to utter it. ". . . the liberty of the press is no greater and no less than the liberty of every subject of the Queen," *Regina* v. *Gray,* [1900] 2 Q. B. 36, 40, and, in the United States, it is no greater than the liberty of every citizen of the Republic. The right to undermine proceedings in court is not a special prerogative of the press.

---

[12] 30 Mich. L. Rev. at 232; 66 U. S. Law Rev. at 377; 11 Phil. L. J. at 280. In an address before the 1936 meeting of the American Bar Association Delegates, Sir Willmott Lewis, the veteran Washington correspondent of *The Times* (London) expressed these views:

"The point I would make is that neither the tradition of orderly legal procedure, nor the obligation which the press should recognize to the maintenance of that tradition, can, *in themselves,* be enough amid the pressure and vulgarity of the modern world.

"Tradition and obligation must be *buttressed by rules,* and *those rules must be enforced* in the domain of their immediate application, by the court itself. . . .

"I think it intolerable, and I cannot think that it should not be punishable, that a charge lying against any citizen should be irresponsibly tried in the public prints, whose plain duty is the reporting, and not the hearing, of causes. . . ." (1936) 20 J. Am. Jud. Soc. 84, 86.

The press does have the right, which is its professional function, to criticize and to advocate. The whole gamut of public affairs is the domain for fearless and critical comment, and not least the administration of justice. But the public function which belongs to the press makes it an obligation of honor to exercise this function only with the fullest sense of responsibility. Without such a lively sense of responsibility a free press may readily become a powerful instrument of injustice.[13] It should not and may not attempt to influence judges or juries before they have made up their minds on pending controversies. Such a restriction, which merely bars the operation of extraneous influence specifically directed to a concrete case, in no wise curtails the fullest discussion of public issues generally. It is not suggested that generalized discussion of a particular topic should be forbidden, or run

---

[13] See the skeptical remarks of H. L. Mencken, a stout libertarian, on the efficacy of journalistic self-restraint:

"Journalistic codes of ethics are all moonshine. Essentially, they are as absurd as would be codes of street-car conductors, barbers or public jobholders. If American journalism is to be purged of its present swinishness and brought up to a decent level of repute—and God knows that such an improvement is needed—it must be accomplished by the devices of morals, not by those of honor. That is to say, it must be accomplished by external forces, and through the medium of penalties exteriorly inflicted." Quoted by LeViness, in *Law and the Press, The Daily Record, Baltimore,* March 11, 1932, p. 3, col. 1, 4.

The author of the article, Mr. LeViness, a Baltimore *Sun* reporter turned lawyer, followed the quotation from Mr. Mencken with this comment:

"This puts the problem, as far as Court and police news goes, squarely back where it belongs: in the lap of the judiciary. The Courts must set the standards; the better journals will follow joyously and the gumchewers' sheets must be whipped into line. The solution is fearless jurists, not afraid of the double-edged sword of contempt process; intelligent jurists, able to exercise this power in the best, enlightened public interest." *Ibid.*

the hazard of contempt proceedings, merely because some phases of such a general topic may be involved in a pending litigation.  It is the focused attempt to influence a particular decision that may have a corroding effect on the process of justice, and it is such comment that justifies the corrective process.

The administration of law, particularly that of the criminal law, normally operates in an environment that is not universal or even general but individual.  The distinctive circumstances of a particular case determine whether law is fairly administered in that case, through a disinterested judgment on the basis of what has been formally presented inside the courtroom on explicit considerations, instead of being subjected to extraneous factors psychologically calculated to disturb the exercise of an impartial and equitable judgment.

If men, including judges and journalists, were angels, there would be no problems of contempt of court.  Angelic judges would be undisturbed by extraneous influences and angelic journalists would not seek to influence them.  The power to punish for contempt, as a means of safeguarding judges in deciding on behalf of the community as impartially as is given to the lot of men to decide, is not a privilege accorded to judges.  The power to punish for contempt of court is a safeguard not for judges as persons but for the function which they exercise.  It is a condition of that function—indispensable for a free society—that in a particular controversy pending before a court and awaiting judgment, human beings, however strong, should not be torn from their moorings of impartiality by the undertow of extraneous influence.  In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries.  That is no more freedom of speech than stuffing a ballot box is an exercise of the right to vote.

Due regard for these general considerations must dispose of the present controversy. Since at the core of our problem is a proper balance between two basic conditions of our constitutional democracy—freedom of utterance and impartial justice—we cannot escape the exercise of judgment on the particular circumstances of the particular case. And we must always bear in mind that since a judgment from a State court comes here as the voice of the State, it must be accorded every fair intendment that in reason belongs to action by a State.

According to the Florida Supreme Court, the charge against petitioners was that "both the editorials and the cartoon were predicated on inaccurate, distorted, incomplete and biased reports of pending litigation, that the purpose and effect of the editorials and the cartoon were to impute partisanship and favor on the part of the circuit judges to those charged with crime and that such partisanship was so pronounced that they refused to heed the voice of the people's representatives. . . . So the vice in both the editorials was the distorted, inaccurate statement of the facts and with that statement were scrambled false insinuations that amounted to unwarranted charges of partisanship and unfairness on the part of the judges." [14] The tenor of the first editorial was complaint of the technicalities and delays of the law which seem to give excessive protection to defendants. It makes no suggestion which could be construed as an attempt to influence the court's decision in a matter actually pending before it. All the questions discussed in the editorial had been acted on by the trial judges. The editor merely indulged in general criticism of those acts as exemplifying an oversolicitous concern for defendants by the law and by the judges who interpreted it. Nor was the cartoon directed toward a particular pending case. Indeed, it partly serves

---

[14] *Pennekamp* v. *State*, 156 Fla. 227, 239, 240, 22 So. 2d 875, 881, 882.

to interpret the editorial as one concerned with a general situation. One suspects that only judicial hypersensitiveness would find in it an animus specifically directed. The opinion of the court illustrates the danger of confusing correction of interference with judicial action with concern over a court's dignity. Instead of treating lightly a cartoon indistinguishable in type from scores of such ephemeral products, the court saw in it wholly undeserved significance.

Again, the second editorial referred to a particular case only as an example. In that case, too, the court had made its decision. What the editor criticized was the speed of disposition and other features of procedure which attended the case. His allowable concern was that the people have a chance to give their argument, that the prosecution in criminal cases be treated as fairly as the defense. Inaccurate and even false comment on litigation no longer pending may not be dealt with by punishing for contempt as a means of assuring the just exercise of the judicial process.

The Florida Supreme Court referred to the cases criticized as "pending." But it did not define the scope of "pending" nor did the grounds of its decision have any particular dependence on the requirement that a case be pending. The finding by a State court that a case is "pending" in the sense relevant to the power to punish for contempt does not, of course, bar its review here. Otherwise a State court could foreclose our protection of the constitutional right of free speech by putting forth as a non-federal ground of decision that which is an essential aspect of the federal question. *Union Pacific R. Co.* v. *Public Service Comm'n,* 248 U. S. 67, 69–70; *Ward* v. *Love County,* 253 U. S. 17, 22; *Davis* v. *Wechsler,* 263 U. S. 22.

If it is contemptuous to bring the courts of a State into disrepute and generally to impair their efficiency, then it

can make no difference on what occasion or with reference to what event that effect is achieved or attempted. But when it is understood what is meant by a "pending" case, it becomes plain that for purposes of punishing for contempt as interference, the cases were not actively pending. "Pending" is not used with the technical inclusiveness that it has in the phrase *lis pendens*. In the situations in which that phrase has meaning and applicability, the important considerations are whether any proceedings have been taken to put the issue into court and whether it is still there. Where the power to punish for contempt is asserted, it is not important that the case is technically in court or that further proceedings, such as the possibility of a rehearing, are available. "When a case is pending is not a technical, lawyer's problem, but is to be determined by the substantial realities of the specific situation." *Bridges* v. *California,* 314 U. S. 252, 279, at 303–304 (dissent). The decisive consideration is whether the judge or the jury is, or presently will be, pondering a decision that comment seeks to affect. Forbidden comment is such as will or may throw psychological weight into scales which the court is immediately balancing. *Cf.* L. Hand, J., in *Ex parte Craig,* 282 F. 138, 159–60. In the situation before us, the scales had come to rest. The petitioners offended the trial court by criticizing what the court had already put in the scales, not by attempting themselves to insert weights.

The petitioners here could not have disturbed the trial court in its sense of fairness but only in its sense of perspective. The judgment must, I agree, be reversed.

Mr. Justice Murphy, concurring.

Were we to sanction the judgment rendered by the court below we would be approving, in effect, an unwarranted restriction upon the freedom of the press. That freedom

covers something more than the right to approve and condone insofar as the judiciary and the judicial process are concerned. It also includes the right to criticize and disparage, even though the terms be vitriolic, scurrilous or erroneous. To talk of a clear and present danger arising out of such criticism is idle unless the criticism makes it impossible in a very real sense for a court to carry on the administration of justice. That situation is not even remotely present in this case.

Judges should be foremost in their vigilance to protect the freedom of others to rebuke and castigate the bench and in their refusal to be influenced by unfair or misinformed censure. Otherwise freedom may rest upon the precarious base of judicial sensitiveness and caprice. And a chain reaction may be set up, resulting in countless restrictions and limitations upon liberty.

MR. JUSTICE RUTLEDGE, concurring.        ·

One can have no respect for a newspaper which is careless with facts and with insinuations founded in its carelessness. Such a disregard for the truth not only flouts standards of journalistic activity [1] observed too often by

---

[1] See the following codes of ethics published in Crawford, The Ethics of Journalism (1924) App. A.: Canons of Journalism, adopted by the American Society of Newspaper Editors in 1923, Art. IV; The Oregon Code of Ethics, adopted by the Oregon State Editorial Association in 1922, Art. I; South Dakota Code of Ethics, adopted by the South Dakota Press Association in 1922, "Truth and Honesty"; Missouri Declaration of Principles and Code of Practice, adopted by the Missouri Press Association in 1921, "Editorial." And see in the same volume the extracts from rules and suggestions prepared by the following newspapers for the guidance of their staffs: The Brooklyn Eagle, The Christian Science Monitor, The Springfield Union, The Detroit News, The Hearst Newspapers (personal instructions given by William Randolph Hearst to his newspapers), The Sacramento Bee, The Kansas City Journal-Post, The Marion Star (written

breach, but in fact tends to bring the courts and those who administer them into undeserved public obloquy.

But if every newspaper which prints critical comment about courts without justifiable basis in fact, or withholds the full truth in reporting their proceedings or decisions, or goes even further and misstates what they have done, were subject on these accounts to punishment for contempt, there would be few not frequently involved in such proceedings. There is perhaps no area of news more inaccurately reported factually, on the whole, though with some notable exceptions, than legal news.

Some part of this is due to carelessness, often induced by the haste with which news is gathered and published, a smaller portion to bias or more blameworthy causes. But a great deal of it must be attributed, in candor, to ignorance which frequently is not at all blameworthy. For newspapers are conducted by men who are laymen to the law. With too rare exceptions their capacity for misunderstanding the significance of legal events and procedures, not to speak of opinions, is great. But this is neither remarkable nor peculiar to newsmen. For the law, as lawyers best know, is full of perplexities.

In view of these facts any standard which would require strict accuracy in reporting legal events factually or in commenting upon them in the press would be an impossible one. Unless the courts and judges are to be put above criticism, no such rule can obtain. There must be

by President Harding when editing The Star). See also Sharkey, The Ethics of Journalism, An Address Delivered before the Press Conference of the World, Geneva, Switzerland, September 15, 1926, p. 10; Wicks, Ideals and Methods of English Newspapers, published in Journalistic Ethics and World Affairs, Addresses Delivered at the Fifteenth Annual Journalism Week at the University of Missouri, 1924, 25 U. of Mo. Bull. (No. 32) 25, 26; Gibbons, Newspaper Ethics (1926) 16 *et seq.*

some room for misstatement of fact, as well as for misjudgment, if the press and others are to function as critical agencies in our democracy concerning courts as for all other instruments of government.

Courts and judges therefore cannot be put altogether beyond the reach of misrepresentation and misstatement. That is true in any case, but perhaps more obviously where the judiciary is elective, as it is in most of our states, including Florida. See *Storey* v. *Illinois,* 79 Ill. 45, 52; (1927) 41 Harv. L. Rev. 254, 255. The question, and the standard, must be one of degree and effects. It cannot be placed at mere falsity, either in representation or in judgment. The statement, whether of fact or of opinion, must be of such a character, whether true or false, as to obstruct in some clear and substantial way the functioning of the judicial process in pending matters. *Bridges* v. *California,* 314 U. S. 252.[2] It is not enough that the judge's sensibilities are affected or that in some way he is brought generally into obloquy. After all, it is to be remembered that it is judges who apply the law of contempt, and the offender is their critic.

The statements in question are clearly fair comment in large part. Portions exceed that boundary. But the record does not disclose that they tended in any way to block or obstruct the functioning of the judicial process. Accordingly I concur in the Court's opinion and judgment.

---

[2] "Nor does the fact that the letter was false, while it greatly affects the moral quality of the act, determine its criminality. It is punishable only if it interferes with justice, and in that respect truth is harder to meet than falsehood." L. Hand, dissenting in *Ex parte Craig,* 282 F. 138, 161, aff'd *sub nom. Craig* v. *Hecht,* 263 U. S. 255. See also the dissenting opinion of Mr. Justice Holmes, 263 U. S. at 281. But cf. *In re Providence Journal Co.,* 28 R. I. 489, 68 A. 428; *In re San Francisco Chronicle,* 1 Cal. 2d 630, 36 P. 2d 369.