*In re* TURNER

1. CONTEMPT—COURTS—CORRUPTION.

> An oral statement made by defendant outside of court that the control which a named attorney exercised over the courts of a certain county was more vicious than the control exercised by the Mafia in New York City and Chicago and a statement published by defendant in his magazine that this same attorney had almost totally corrupted the entire judicial system in that county did not constitute contempt of court as these statements neither concerned nor affected the outcome of pending litigation.

2. CONTEMPT—COURTS—DISRESPECT.

> The contempt power is not allowed to be exercised where there is disrespect to the judiciary by publication since respect for the judiciary cannot be won by shielding judges from published criticism.

3. CONTEMPT — COMMENTS — INACCURATE — FALSE — VICIOUS — PENDING LITIGATION.

> Inaccurate, false, or even vicious, comments regarding the judiciary, which does not affect pending litigation, must not be dealt with by the contempt power as a means of assuring the just exercise of the judicial process.

4. CONSTITUTIONAL LAW—FREEDOM OF THE PRESS—COURTS.

> Freedom of the press includes the right to criticize and disparage the judiciary and the judicial process even though the criticism is vitriolic, scurrilous or erroneous.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contempt § 13.
[2] 17 Am Jur 2d, Contempt § 55.
[3] 17 Am Jur 2d, Contempt § 61.
[4, 5] 16 Am Jur 2d, Constitutional Law § 341 *et seq.*

5. Contempt—Courts—Disparaging Statements—Defense.
   The unsullied performance of their judicial duties is the best defense of a judiciary which has been made the subject of disparaging statements.

Appeal from Livingston, James R. Breakey, Jr., presiding. Submitted Division 2 April 11, 1969, at Lansing. (Docket No. 5,846.) Decided December 10, 1969.

James C. Turner was adjudged in contempt of court. Defendant appeals. Reversed.

*Burke, Burke, Ryan & Rennell,* for plaintiff, Michael Carland, J.

*Paul R. Mahinske* for defendant.

*Amici Curiae:* Knight Newspapers, Inc., by *Kenneth Murray* and *Brownson Murray.*

Central Michigan Chapter of Sigma Delta Chi, by *Fred S. Siebert* (*Kenneth Murray* and *Brownson Murray,* of counsel).

Michigan Press Association and American Newspaper Guild, Local No. 24, by *Fred S. Siebert* (*George H. Krause,* of counsel).

Before: R. B. Burns, P. J., and Levin and Bronson, JJ.

Bronson, J.  James C. Turner was found guilty of contempt of court in Livingston County. Such finding was by way of summary judgment. These proceedings arise out of a statement read by Turner at a meeting of the Industrial Committee of the

Howell Chamber of Commerce, and out of a statement printed in an issue of "Today" magazine. "Today" magazine is published by Turner. Soon after Turner's statements were made, he was served with a petition and then with an *ex parte* order to show cause why he should not be adjudged in contempt of court. Pleadings were filed with the trial court and the trial judge then disqualified himself from hearing the case and requested that the Michigan Supreme Court Administrator assign another judge to hear the matter. During the course of the argument, defendant Turner made a motion to dismiss, which was denied. He also made a demand for a jury trial, which was denied. At the show cause hearing, the court offered as evidence three exhibits. Exhibit A reads:

"State of Michigan          ss.:
"County of Livingston

"Robert E. Kleeb, being first duly sworn, deposes and says:

"That he resides in the city of Howell, and is a practicing attorney maintaining offices in said city.

"That on or about the 13th day of February, 1968, that he attended a meeting of the Industrial Committee of the Howell Chamber of Commerce. That present at that meeting were citizens and residents of the City of Howell in the County of Livingston. That also present at said meeting was one James C. Turner, the publisher of a magazine known as 'Today', and having some circulation in the county of Livingston. That during the course of said meeting, the said James C. Turner read excerpts from a letter purportedly written by one Hiram R. Smith, and thereby orally published the contents thereof. That the substance of such publication was as follows:

" 'That the control which Martin J. Lavan exercises over the courts of Livingston county is more vicious than the control exercised by the Mafia in New York and Chicago.'

"Further this deponent sayeth not.

"/s/ROBERT E. KLEEB

"Subscribed and sworn to before me this 8th day of April, A. D. 1968.

/s/MARGARET H. GORTE

Notary Public, Shiawassee County, Michigan, acting in Livingston County, Mich.

My commission expires Oct. 18, 1970."

Exhibit B reads:

"State of Michigan       ss.:
"County of Livingston

"Wilfred H. Erwin, being first duly sworn, deposes and says:

"That he is a member of the State Bar of Michigan and maintains offices for the practice of law in the city of Howell, Livingston county, Michigan.

"That one James C. Turner resides in the city of Howell.

"That on April 5, 1968, there appeared on the news stands in the city of Howell the April issue of a magazine known as 'Today', published by the said James C. Turner. That this deponent is in possession of a copy of such issue, and has read the contents thereof. That on page four thereof, under the heading, 'A Letter from the Publisher,' and in paragraph five appears the following:

" 'Martin J. Lavan, who did this to Orpha Bowe has almost totally corrupted the entire judicial system in Livingston County. We believe the judges and most of the attorneys either live in fear of this man, or,

for some reason, are afraid or won't speak out against the system.'

"Further this deponent sayeth not.

"/s/WILFRED H. ERWIN

"Subscribed and sworn to before me this 8th day of April, A. D. 1968.

/s/MARGARET H. GORTE

Notary Public, Shiawassee County, Michigan, acting in Livingston County, Mich.

My commission expires Oct. 18, 1970."

Exhibit C is a copy of "Today" magazine. [vol 1, no 5]. Plaintiff offered no additional evidence or proof at the hearing below other than exhibits A, B, and C.

Defendant Turner testified that he believed his stated charges of corruption against the judiciary in Livingston county were true when he made such charges, and that he still believed them to be true at the time he gave testimony at the show-cause hearing. Turner, through his attorney, filed a statement with the court on May 29, 1968, in which he stated his intention:

" * * * to show by testimony of various persons and by the introduction of affidavits and copies of public records and other evidence the following by way of explanation of the general situation and attitude regarding the opinion and concern of many toward the judicial system in Livingston county and the action or lack of action on the part of the County Bar Association.

\*        \*        \*

"Testimony will also be forthcoming from various public officials and/or administrator regarding their past contacts with judicial officers and courts regarding their function or lack of activities in areas deemed important and proper to the community at large."

A careful scrutiny of the transcript and record indicates that defendant did not fufill his intentions. At no time did he testify to any facts which could form a foundation for such belief.

Defendant Turner was found guilty of contempt of court, fined $150 and ordered to jail for 15 days. From this verdict, he appeals.

On appeal this Court is called upon to resolve two questions:

Is a person who is cited for contempt of court for statements or publications made outside the view and presence of the court which allege the corruption of the entire judicial bench of a county circuit court entitled to a jury trial?
Did the lower court err in finding the respondent guilty of contempt of court?

For purposes of this decision, we need only consider the latter.

"The evils envisioned in the contempt by publication cases are disrespect to the judiciary, and interference with the administration of justice. Through the years, the Supreme Court has not allowed the exercise of the contempt power in the former instance. Their rationale has been that judges should be above personal attack, and that popular respect is less apt to be gained from the exercise of the contempt power than from exemplary judicial standards subject to free criticism. 'The assumption,' Justice Black noted, 'that respect for the judiciary can be won by shielding judges from published criticism wrongly appraised the character of American public opinion.'

"Though recognizing the possibility of contempt treatment in the second category of press comments (intereference with the administration of justice) courts have been chary to find the instance where the need to protect the fairness of trials overrode the value to be gained from allowing free discussion.

These cases indicate that the courts in their decisions are more concerned with the free press-fair trial civil liberties conflict than with developing a consistent doctrine with respect to the power to punish contempts by publication on theories bedded in the contempt power itself. 'The Supreme Court's formula seems to grant the press a virtual immunity from contempt rather than resolve its historic struggle with the courts.' "

Ronald L. Goldfarb, *The Contempt Power* (Columbia University Press, 1963) ch 4, p 189.

Plaintiff recognizes that in order to sustain a contempt conviction Turner's allegations must be found to concern the outcome of pending cases. See *Bridges* v. *California* (1941), 314 US 252 (62 S Ct 190, 86 L Ed 192), *Pennekamp* v. *Florida* (1946), 328 US 331 (66 S Ct 1029, 90 L Ed 1295) and *Craig* v. *Harney* (1947), 331 US 367 (67 S Ct 1249, 91 L Ed 1546).[1]

---

[1] Frankfurter, J., in a concurring opinion in *Pennekamp* v. *Florida, supra,* wrote, pp 366–369:

"The power to punish for contempt, as a means of safeguarding judges in deciding on behalf of the community as impartially as is given to the lot of men to decide, is not a privilege accorded to judges. The power to punish for contempt of court is a safeguard not for judges as persons but for the function which they exercise. It is a condition of that function—indispensable for a free society—that in a particular controversy pending before a court and awaiting judgment, human beings, however strong, should not be torn from their moorings of impartiality by the undertow of extraneous influence."

*     *     *

"The Florida Supreme Court referred to the cases criticized as 'pending.' But it did not define the scope of 'pending' nor did the grounds of its decision have any particular dependence on the requirement that a case be pending. The finding by a State court that a case is 'pending' in the sense relevant to the power to punish for contempt does not, of course, bar its review here. Otherwise a State court could foreclose our protection of the constitutional right of free speech by putting forth as a non-federal ground of decision that which is an essential aspect of the federal question. *Union Pac. R. Co.* v. *Public Service Commission of Missouri* (1918), 248 US 67, 69, 70 (39 S Ct 24, 25, 63 L Ed 131, 132, 133, 1919B PUR 315, 316–318); *Ward* v. *Board of Road Commissioners of Love County* (1920), 253 US 17, 22 (40 S Ct 419, 421, 64 L Ed 751, 758); *Davis* v. *Wechsler* (1923), 263 US 22 (44 S Ct 13, 68 L Ed 143)."

In *Bridges* v. *California, supra,* the United States Supreme Court dealt with convictions resting "upon comments pertaining to pending litigation which were published in newspapers". In *Bridges* the Court stated, p 263:

"What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights. For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."

"If it is contemptuous to bring the courts of a State into disrepute and generally to impair their efficiency, then it can make no difference on what occassion or with reference to what event, that effect is achieved or attempted. But when it is understood what is meant by a 'pending' case, it becomes plain that for purposes of punishing for contempt as interference, the cases were not actively pending."

See, also, *Craig* v. *Harney, supra,* wherein the Court stated pp 377, 378:

"The editorial challenged the propriety of the court's procedure, not the merits of its ruling. Any such challenge, whether made prior or subsequent to the final disposition of a case, would likely reflect on the competence of the judge in handling cases. But as we have said, the power to punish for contempt depends on a more substantial showing. *Giving the editorial all of the vehemence which the court below found in it we fail to see how it could in any realistic sense create an imminent and serious threat to the ability of the court to give fair consideration to the motion for rehearing.*

"There is a suggestion that the case is different from *Bridges* v. *California, supra,* in that we have here only private litigation, while in the *Bridges* case labor controversies were involved, some of them being criminal cases. The thought apparently is that the range of permissible comment is greater where the pending case generates a public concern. The nature of the case may, of course, be relevant in determining whether the clear and present danger test is satisfied. But, the rule of the *Bridges* and *Pennekamp* cases is fashioned to serve the needs of all litigation, not merely select types of pending cases." (Emphasis added.)

The court, in *Bridges,* looked to the particular utterances in question and to the circumstances under which they were published in order to determine "to what extent the substantive evil of unfair administration of justice" would likely result.

"The substantive evil here sought to be averted has been variously described below. It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however, limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

"The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. The very word 'trial' connotes decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. But we cannot start with the assumption that publications of the kind here involved actually do threaten to change the nature of legal trials, and that to preserve judicial impartiality, it is necessary for judges to have a contempt power by which they can close all channels of public expression to all matters which touch upon pending cases." *Bridges* v. *California, supra,* pp 270, 271.

In *Pennekamp* v. *Florida, supra,* the United States Supreme Court reversed a contempt conviction based upon publications (again concerning

pending cases). There the court in amplification
of *Bridges* stated:[2]

"Whether the threat to the impartial and orderly
administration of justice must be a clear and
present or a grave and immediate danger, a real
and substantial threat, one which is close and direct
or one which disturbs the court's sense of fairness
depends upon a choice of words. Under any one
of the phrases, reviewing courts are brought in cases
of this type to appraise the comment on a balance
between the desirability of free discussion and the

---

[2] "*Bridges* v. *California* fixed reasonably well-marked limits around
the power of courts to punish newspapers and others for comments
upon or criticism of pending litigation. The case placed orderly
operation of courts as the primary and dominant requirement in the
administration of justice. Pp 263, 265, 266. This essential right
of the courts to be free of intimidation and coercion was held to be
consonant with a recognition that freedom of the press must be
allowed in the broadest scope compatible with the supremacy of
order. A theoretical determinant of the limit for open discussion
was adopted from experience with other adjustments of the conflict
between freedom of expression and maintenance of order. This was
the clear and present danger rule. The evil consequence of comment
must be 'extremely serious and the degree of imminence extremely
high before utterances can be punished.' P 263. It was, of course,
recognized that this formula, as would any other, inevitably had the
vice of uncertainty, p 261, but it was expected that from a decent
self-restraint on the part of the press and from the formula's repeated
application by the courts, standards of permissible comment would
emerge which would guarantee the courts against interference and
allow fair play to the good influences of open discussion. As a
step toward the marking of the line, we held that the publications
there involved were within the permissible limits of free discussion.
  "In the *Bridges* case the clear and present danger rule was applied
to the stated issue of whether the expressions there under considera-
tion prevented 'fair judicial trials free from coercion or intimidation.'
P 259. There was, of course, no question as to the power to punish
for disturbances and disorder in the court room. P 266. The danger
to be guarded against is the 'substantive evil' sought to be prevented.
Pp 261–263. In the *Bridges* case that 'substantive evil' was primarily
the 'disorderly and unfair administration of justice.' Pp 270, 271,
278.

                    *        *        *

  "While there was a division of the court in the *Bridges* case as
to whether some of the public expressions by editorial comment
transgressed the boundaries of a free press and as to the phrasing
of the test, there was unanimous recognition that California's power
to punish for contempt was limited by this court's interpretation
of the extent of protection afforded by the First Amendment."
*Pennekamp* v. *Florida*, *supra*, at pp 334–336.

necessity for fair adjudication, free from interruption of its processes." *Pennekamp* v. *Florida, supra,* at 336.

In discussing the clear and present danger test applied in *Bridges,* the court in *Pennekamp* (pp 348, 349)[3] said:

"What is meant by clear and present danger to a fair administration of justice? No definition could give an answer. Certainly this criticism of the judges' inclinations or actions in these pending nonjury proceedings could not directly affect such administration. This criticism of their actions could not affect their ability to decide the issues. Here there is only criticism of judicial action already taken, although the cases were still pending on other points or might be revived by rehearings. For such injuries, when the statements amount to defamation, a judge has such remedy in damages for libel as do other public servants."

The United States Supreme Court in *Craig* v. *Harney, supra,* based its decision on *Bridges* and *Pennekamp.* The facts were similar to those cases but the lower court concluded that they satisfied the clear and present danger rule of the *Bridges* case. The United States Supreme Court, in reversing, interpreted the words "clear and present danger" in terms of the language published:

"This was strong language, intemperate language, and, we assume, an unfair criticism. But a judge may not hold in contempt one 'who ventures to publish anything that tends to make him unpopular or to belittle him * * * ' See *Craig* v. *Hecht* (1923), 263 US 255, 281 (44 S Ct 103, 108, 68 L Ed 293, 301), Mr. Justice Holmes dissenting. The ve-

---

[3] We are not unaware that public officials will take but little solace in their reliance upon libel and slander actions against those who defame them. See *New York Times Co.* v. *Sullivan* (1964), 376 US 254 (84 S Ct 710, 11 L Ed 2d 686).

hemence of the language used is not alone the
measure of the power to punish for contempt. The
fires which it kindles must constitute an imminent,
not merely a likely, threat to the administration of
justice. The danger must not be remote or even
probable; it must immediately imperil." *Craig* v.
*Harney,* at p 376.

In adhering to the belief that "free discussion of
the problems of society is a cardinal principle of
Americanism—a principle which all are zealous to
preserve",[4] we conclude that inaccurate comment,
false comment, even vicious comment regarding the
court which does not affect pending litigation must
not be dealt with by the contempt power as a means
of assuring the just exercise of the judicial process.
See *Pennekamp* v. *Florida,* Frankfurter, J., concur-
ring, at p 368.[5]

---

[4] *Pennekamp* v. *Florida,* at p 346.

[5] "Were we to sanction the judgment rendered by the court below
we would be approving, in effect, an unwarranted restriction upon the
freedom of the press. That freedom covers something more than
the right to approve and condone insofar as the judiciary and the
judicial process are concerned. It also includes the right to crit-
icize and disparage, even though the terms be vitriolic, scurrilous
or erroneous. To talk of a clear and present danger arising out of
such criticism is idle unless the criticism makes it impossible in a
very real sense for a court to carry on the administration of justice.
That situation is not even remotely present in this case.

"Judges should be foremost in their vigilance to protect the free-
dom of others to rebuke and castigate the bench and in their
refusal to be influenced by unfair or misinformed censure. Other-
wise freedom may rest upon the precarious base of judicial sensitive-
ness and caprice. And a chain reaction may be set up, resulting in
countless restrictions and limitations upon liberty." *Pennekamp* v.
*Florida,* at pp 369, 370, Murphy, J., concurring.

"Courts and judges therefore cannot be put altogether beyond the
reach of misrepresentation and misstatement. That is true in any
case, but perhaps more obviously where the judiciary is elective, as
it is in most of our states, including Florida. See *Storey* v. *People*
(1875), 79 Ill 45, 52 (22 Am Rep 158, 164); 41 Harv L Rev 254,
255 (1927). The question, and the standard, must be one of degree
and effects. It cannot be placed at mere falsity, either in representa-
tion or in judgment. The statement, whether of fact or of opinion,
must be of such a character, whether true or false, as to obstruct
in some clear and substantial way the functioning of the judicial
process in pending matters. *Bridges* v. *California* (1941), 314 US
252 (62 S Ct 190, 86 L Ed 192, 159 ALR 1346). It is not enough

Forceful arguments are presented by each side in the present controversy.[6]

When two fundamental and integral *parts* of the democratic process clash head on, as in the case here, the vindication of the proponents on the one side must seemingly be to the detriment of the proponents on the other side.[7] In the present action, if we uphold the right of the press to make what may well be unfounded allegations, we expose the Livingston County bench to possible further attack which could result in the diminishment of the stature of a whole bench. If, on the other hand, we find Turner to have been in contempt, we dimin-

---

that the judge's sensibilities are affected or that in some way he is brought generally into obloquy. After all, it is to be remembered that it is judges who apply the law of contempt, and the offender is their critic." *Pennekamp* v. *Florida*, at p 372, Rutledge, J., concurring.

"The press does have the right, which is its professional function, to criticize and to advocate. The whole gamut of public affairs is the domain for fearless and critical comment, and not least the administration of justice. But the public function which belongs to the press makes it an obligation of honor to exercise this function only with the fullest sense of responsibility. Without such a lively sense of responsibility a free press may readily become a powerful instrument of injustice. It should not and may not attempt to influence judges or juries before they have made up their minds on pending controversies. Such a restriction, which merely bars the operation of extraneous influence specifically directed to a concrete case, in no wise curtails the fullest discussion of public issues generally." *Pennekamp* v. *Florida*, at p 365, Frankfurter, J.. concurring.

6 "In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries. That is no more freedom of speech than stuffing a ballot box is an exercise of the right to vote." *Pennekamp* v. *Florida*, at p 366, Frankfurter, J., concurring.

"I believe that the importance of the problem raised by this case cannot be overemphasized. A free press lies at the heart of our democracy and its preservation is essential to the survival of liberty. Any inroad made upon the constitutional protection of a free press tends to undermine the freedom of all men to print and to read the truth." *Craig* v. *Harney, supra*, Murphy, J., concurring.

7 "Since at the core of our problem is a proper balance between two basic conditions of our constitutional democracy—freedom of utterance and impartial justice—we cannot escape the exercise of judgment on the particular circumstances of the particular case." *Pennekamp* v. *Florida*, at p 367, Frankfurter, J., concurring.

ish the right of the people to be free from prior
censorship and restraint. "We must, therefore,
[carefully] weigh the right of free speech which is
claimed   *   *   *   against the danger of the coercion
and intimidation of courts in the factual situation
presented by this record." *Pennekamp* v. *Florida*
(1946), 328 US 331, 346 (66 S Ct 1029, 1037; 90 L
Ed 1295, 1303).

In reaching our decision we are guided by the
rule set out in *Pennekamp* v. *Florida,* at p 347,
that:

"Courts must have power to protect the interests
of prisoners and litigants before them from un-
seemly efforts to pervert judicial action. In the
borderline instances where it is difficult to say upon
which side the alleged offense falls, we think the
specific freedom of public comment should weigh
heavily against a possible tendency to influence
pending cases. Freedom of discussion should be
given the widest range compatible with the essential
requirement of the fair and orderly administration
of justice."

In the present action it is vigorously argued by
plaintiff that, as there were some 500 cases pending
at the time of Turner's attacks, each case then
before the court was sufficient to support a convic-
tion for contempt of court.

In his brief plaintiff asserts:

"[Defendant] says, in effect,   *   *   *   that a
blanket charge that a court is corrupt can have no
effect on the orderly, unbiased administration of
justice in that court in the disposal of the cases
then pending. If such be true, then a corrupt judge
in no way prejudices the rights of citizens who ap-
pear before him except when the charges are made
concerning a case presently before him for final
determination. This argument of the appellant
assumes that because these charges were general

charges of corruption not specifically aimed at a case being tried or having been tried and awaiting final determination, that such a charge does not affect a pending case, and does not therefore affect the orderly administration of justice. That such assumption or argument is fallacious is easily apparent. In effect, it says that what one may not do specifically he may do generally.

"It is the position of the appellee that a charge that a court is corrupt taints every case then pending or which may possibly come before the court for determination with the possibility that fair and impartial justice will be denied in the final determination of such cases. Such a charge, in effect, poisons the clear waters of justice by which every litigant is entitled to be refreshed. A poisoned well is a useless, dangerous well. A corrupt court is equally useless, dangerous, and is bound to destroy a people's faith in the integrity of its courts and its other democratic institutions. Therein lies the clear and present danger to those institutions (our courts) which have hitherto been deemed to be the best guardians of civil liberty."

While recognizing the strong appeal made by plaintiff, we cannot accept the mistaken syllogism that allegations of corruption in and of themselves create corruption. Plaintiff needs no defense of his position other than an impeccable reputation as a jurist.

Even if the attacks against the Livingston County judiciary by Turner are in fact irresponsible or scurrilous, we see no effect upon pending cases. As the United States Supreme Court stated in *Pennekamp* v. *Florida* (pp 347-349):

"The comments were made about judges of courts of general jurisdiction—judges selected by the people of a populous and educated community. They concerned the attitude of the judges toward those who were charged with crime, not comments

on evidence or rulings during a jury trial. Their effect on juries that might eventually try the alleged offenders against the criminal laws of Florida is too remote for discussion. Comment on pending cases may affect judges differently. It may influence some judges more than others. Some are of a more sensitive fiber than their colleagues. The law deals in generalities and external standards and cannot depend on the varying degrees of moral courage or stability in the face of criticism which individual judges may possess any more than it generally can depend on the personal equations or individual idiosyncrasies of the tortfeasor. *The Germanic* (1905), 196 US 589, 596 (25 S Ct 317, 318, 49 L Ed 610, 613); *Arizona Employers' Liability Cases* (1919), 250 US 400, 422, 432 (39 S Ct 553, 556, 560, 63 L Ed 1058, 1067, 1071, 6 ALR 1537, 1545, 1546, 1551). We are not willing to say under the circumstances of this case that these editorials are a clear and present danger to the fair administration of justice in Florida. *Cf. Near* v. *Minnesota* (1931), 283 US 697, 714, 715 (51 S Ct 625, 630 631, 75 L Ed 1357, 1366, 1367).

\*       \*       \*

"It is suggested, however, that even though his intellectual processes cannot be affected by reflections on his purposes, a judge may be influenced by a desire to placate the accusing newspaper to retain public esteem and secure reelection presumably at the cost of unfair rulings against an accused. In this case too many fine-drawn assumptions against the independence of judicial action must be made to call such a possibility a clear and present danger to justice. For this to follow, there must be a judge of less than ordinary fortitude without friends or support or a powerful and vindictive newspaper bent upon a rule or ruin policy, and a public unconcerned with or uninterested in the truth or the protection of their judicial institutions. If, as the Florida courts have held and as we have assumed,

the petitioners deliberately distorted the facts to abase and destroy the efficiency of the court, those misrepresentations with the indicated motives manifested themselves in the language employed by petitioners in their editorials."

It is error to assume that because a court is charged with corruption it is incapable of acting in any other than a corrupt manner. It is plaintiff's contention that in the eyes of the people a court so charged is suspect in its decisions. Accordingly, what we are being asked to consider here is not the integrity of the court in its handling of those 500 pending cases, but rather the manner in which those opinions would be received.

Plaintiff contends that every decision in those cases would be suspect in the eyes of the public and the losing party. We believe otherwise. Subsequent finding that Turner was guilty of contempt will not cleanse nor vindicate the bench in the eyes of those who choose to believe his allegations.

As previously stated, the requisite showing of contempt in a case such as the one before us is an immediate peril of undue influence or coercion upon pending litigation. The United States Supreme Court said in *Bridges* v. *California* (1941), 314 US 252, 262 (62 S Ct 190, 193, 194, 86 L Ed 192, 203), that:

"[T]he likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be 'substantial,' Brandeis, J., concurring in *Whitney* v. *California* (1927), 274 US 357, 374 (47 S Ct 641, 647, 648, 71 L Ed 1095, 1105); it must be 'serious', *id.* 376."

Here we are dealing with a general accusation leveled at an entire bench. What is the best course of action for a judge, a member of the bench so

accused? The answer must, we feel, be nothing, "for 'public men, are, as it were, public property,' and 'discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled.' " *New York Times Co.* v *Sullivan* (1964), 376 US 254, 268 (84 S Ct 710, 720, 11 L Ed 2d 686, 699).

The Livingston bench was made the subject of disparaging statements. The best defense judges may present to the public is the unsullied performance of their judicial duties.[8] For ultimately it is that very public trust and confidence which plaintiff fears the erosion of, which must be depended upon to vindicate the court.[9]

Reversed.[10] No costs, a public question being involved.

All concurred.

---

[8] "Silence and a steady devotion to duty are the best answers to irresponsible criticism; and those judges who feel the need for giving a more visible demonstration of their feelings may take advantage of various laws passed for that purpose which do not impinge upon a free press. The liberties guaranteed by the First Amendment, however, are too highly prized to be subjected to the hazards of summary contempt procedure." *Craig* v. *Harney* (1947), 331 US 367 (67 S Ct 1249, 91 L Ed 1546), Murphy, J., concurring at pp 384, 385.

[9] See *Pennekamp* v. *Florida* where the Court stated at pp 349, 350:

"The Florida courts see in this objectionable language an open effort to use purposely the power of the press to destroy without reason the reputation of judges and the competence of courts. This is the clear and present danger they fear to justice. Although we realize that we do not have the same close relations with the people of Florida that is enjoyed by the Florida courts, we have no doubt that Floridians in general would react to these editorials in substantially the same way as citizens of other parts of our common country.

"As we have pointed out, we must weigh the impact of the words against the protection given by the principles of the First Amendment, as adopted by the Fourteenth, to public comment on pending court cases. We conclude that the danger under this record to fair judicial administration has not the clearness and immediacy necessary to close the door of permissible public comment. When that door is closed, it closes all doors behind it."

[10] Because of the decision reached on the issue of contempt we find it unnecessary to consider the question of defendant's having been denied a jury trial.