OPINION OF THE COURT
Aileen Haas Schwartz, J.
Has jurisprudential antipathy to imprisonment for debt blinded the law to the plight of a needy child whose financially able father categorically refuses to comply with an order of support?
The instant proceeding for an order of commitment to jail pursuant to section 454 of the Family Court Act graphically illustrates the character and concomitant difficulties of present-day support enforcement litigation.
The mother and father have been engaged in acrimonious litigation involving child support for a substantial part of the years following the dissolution of their 12-year-old marriage by divorce in February, 1978. There have been several proceedings; there have been several lengthy trials before different Judges. With the exception of cross petitions, the mother has instituted the proceedings in the first instance for an order of support, and subsequently primarily for enforcement of that order. Commencing with the first proceeding, the father adopted the practice of disregarding orders of the court.
*299 The predicate order in the instant proceeding pursuant to section 454 of the Family Court Act seeking an order committing the father to jail is the order of July 6, 1983, directing payment of arrears. There is no present challenge on procedural grounds, nor does the father contest the fact of nonpayment. Respondent’s principal opposition focused upon his alleged inability to comply with the order. However, respondent’s own evidence of his financial status and personal assets and expenditures conclusively contradicted that claim.
His testimony which can best be characterized as a game of ducks and drakes established beyond a reasonable doubt that respondent had far more than sufficient funds to comply with the order of July 6, 1983 at the time of its entry and subsequent thereto and, of critical significance, at the very time of the hearing seeking an order of commitment to jail and for the pertinent future.[2] „
The facts establish beyond a reasonable doubt that the respondent has willfully disobeyed the order of this court. Recourse to other enforcement measures would be ineffectual. Despite this, however, there is a natural reluctance to employ that most awesome of judicial powers, commitment to jail for contempt.
Tracing the ancient lineage of contempt, Supreme Court jurisprudence has recognized the awesome power of contempt as a necessary safeguard for our free society:
“[T]he power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed upon them by law * * *
“If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the ‘judicial power of the United States’ would be a mere mockery.” (Gompers v Bucks Stove & Range Co., 221 US 418, 450.) “There can be no free society without law administered through an independent judiciary. If one man can be allowed to determine for himself what is law, every man can. *300 That means first chaos, then tyranny.” (United States v Mine Workers, 330 US 258, 312, Frankfurter, J., concurring.)
Twentieth century reaffirmation of the fundamental role of the contempt power has not meant judicial insensitivity to conflicting precepts. Such conflict looms inevitable. The traditional definition of contempt encompasses not only disobedience to judicial process and orders but also “acts which hinder the administration of justice, such as disturbing the proceedings of the Court while it is sitting (contempt in court) or libelling a Judge or publishing comments on a pending case (contempt out of court).” (Fox, History of Contempt of Court, p 2.) By its very definition, the contempt power to punish for expression, particularly out-of-court expression, clashes with fundamental rights of the individual. Supreme Court jurisprudence views the First Amendment as a constitutional shield against punishment for a broad category of seemingly contemptuous out-of-court expression. (Bridges v California, 314 US 252; Pennekamp v Florida, 328 US 331; Craig v Harney, 331 US 367.)
Indeed, the history of the law of contempt in the United States reflects judicial and legislative concern for the awesome nature of the contempt power and the necessarily attendant potential for abuse. (See Bloom v Illinois, 391 US 194, 202-203; Matter of Terry, 128 US 289, 313.) State Legislatures also have delineated substantive and procedural standards for exercise of the contempt power. (See, e.g., Judiciary Law, art 19; Domestic Relations Law, §§ 245, 246; Family Ct Act, §§ 454, 455; see Krause, Child Support in America, The Legal Perspective, pp 61-74.) Symbolic of judicial sensitivity is the Supreme Court’s admonition that the contempt power is “sparingly to be used”. (Gompers v Bucks Stove & Range Co., 221 US, at p 450.)
The Supreme Court has focused on procedural due process considerations by virtue of the nature of the conventional remedy for contempt — imprisonment — and apparently the widespread practice of exercising the contempt power summarily. It may now be said that “[t]he narrow exception to these due process requirements includes only *301 charges of misconduct, in open court, in the presence of the judge, which disturbs the court’s business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent ‘demoralization of the court’s authority’ before the public.” (Matter of Oliver, 333 US 257, 275.) As acutely perceived by Justice Holmes with regard to criminal contempt, “These con-tempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech.” (Gompers v United States, 233 US 604, 610.) Even earlier, the Supreme Court declared, “[I]t is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself.” (Gompers v Bucks Stove & Range Co., 221 US, at p 444.)
The Holmes’ view fully triumphed in Bloom v Illinois (supra). Largely in reliance upon Fox’ historical detection (analogous to an Agatha Christie mystery), Bloom v Illinois (supra) overruled an array of consistent precedents to hold that the Sixth Amendment right to jury trial applies to prosecutions for contempt just as it does for other crimes.
Manifestly, not all contempts are treated as criminal contempts. Suffice it to say that procedures for adjudication of noncriminal contempt must comport with the same due process standards mandated for all civil proceedings. Indeed, Addington v Texas (441 US 418) compels a more protective standard of proof in civil contempt proceedings than the conventional preponderance of the evidence standard in civil cases. Addington v Texas (supra) held that due process requires a clear and convincing standard of proof in a civil proceeding to commit an individual involuntarily for an indefinite period to a State mental hospital. The degree of certitude required of the fact finder reflects the societal value of the interests at stake and allocates the risk of error intrinsic in litigation. In our society, liberty is an “interest of transcending value”. (Speiser v Randall, 357 US 513, 525.) Notwithstanding the court’s recognition that civil commitment “constitutes a significant depriva *302 tion of liberty” (Addington v Texas, 441 US, at p 425), the Supreme Court expressly declined to adopt the beyond a reasonable doubt standard which the court characterized as an “unique standard of proof * * * regarded as a critical part of the ‘moral force of the criminal law’ (Supra, at p 428.) So, too, in a civil contempt proceeding in which, indeed, it should be further noted, the State is not a party. Addington v Texai (supra), and its progeny, thus instruct that due process commands are met by the clear and convincing standard, albeit as a constitutional minimum, in civil contempt proceedings.
Case law, statutes and commentaries attempt to categorize civil and criminal contempt into exclusive classes. Abstract theory may permit a perfect civil contempt/criminal contempt dichotomy. “Common sense would recognize that conduct can amount to both civil and criminal contempt.” (United States v Mine Workers, 330 US, at pp 298-299.) “It may partake of the characteristics of both.” (Bessette v Conkey Co., 194 US 324, 329.) The oft-cited test enunciated in Gompers v Bucks Stove & Range Co. (221 US, at p 441) focuses upon “character and purpose” and “not the fact of punishment * * * If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.” Judgment for civil contempt serves a reparative or coercive function. In essence, the sanction for civil contempt is an enforcement measure that has been traced to early origin: “ ‘As early as the time of Richard III it was said that the chancellor of England compels a party against whom an order is issued by imprisonment * * * and a little later it was said in the chancery that “a decree does not bind the right, but only binds the person to obedience, so that if the party will not obey, then the chancellor may commit him to prison till he obey * * *” This imprisonment was by no means a punishment, but was merely to secure obedience to the writ of the king.’ ” (United States v Mine Workers, 330 US, at p 331, n 4, Black and Douglas, JJ., concurring and dissenting.) The distinguishing characteristic of imprisonment as a coercive sanction is that the contemnor “[carries] the keys of [his] prison in [his] own pocket”. *303 (Matter of Nevitt, 117 F 448, 461.) The contemner can end his confinement by obedience to the court’s order, for the coercive power of the court ends with obedience to its order. (Gompers v Bucks Stove & Range Co., 221 US, at p 442.)
Obviously, imprisonment for criminal contempt may serve a coercive purpose and adopt the limitations characteristic of imprisonment for civil contempt. Equally clear, imprisonment for civil contempt is not punitive in purpose and may not be punitive in form.
The “purpose and character of imprisonment”, not the fact of imprisonment, may well serve as the judicial test to distinguish criminal contempt from civil contempt. But it is, indeed, the very fact of imprisonment that evokes the spectre of the Dickens family at the Marshalsea prison following “attachment” of Dickens’ father for debt.
Judicial qualms about imprisonment as a classical method of enforcement are not assuaged by the hanging of a new sign — reading “civil” — over one wing of the jailhouse. (Paraphrasing Powell v Texas, 392 US 514, 529.) A further compounding element in the instant matter arises from the nature of the predicate order, an order directing payment of a sum of money. Evolving standards of decency culminated in decisional and statutory strictures against imprisonment for debt. Section 21 of the Civil Rights Law, which can be traced to the Stilwell Act of 1831 (L 1831, ch 300), prohibits imprisonment for debt. New York State public policy against imprisonment for debt has been construed even more broadly than the statutory language of section 21 of the Civil Rights Law. The Court of Appeals early spoke of substantive due process as the foundation for the policy “to exempt from imprisonment the honest debtor who is poor, and in good faith unable to pay his debts.” (Matter of Reeves v Crownshield, 274 NY 74, 78.) Section 245 of the Domestic Relations Law and section 454 of the Family Court Act would appear to constitute extraordinary departures from that doctrine. Indeed, section 245 of the Domestic Relations Law declares that “the provisions of the civil rights law are hereby superseded so far as they are in conflict”. This aberration reflects society’s profound commitment to the family and, more particularly, to the child. The State-family relationship is *304 complex: The law affords constitutional sanctity to the family, rendering the family virtually inviolable to State intrusion. Yet, the law also mandates obligations on the part of the individual members of the family arising from that jural relationship, and the State does intervene to vindicate the concomitant rights of the individual members. The Supreme Court reminds us that “[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.” (Wisconsin v Yoder, 406 US 205, 232.) But the law must address the real as well as the ideal. Section 245 of the Domestic Relations Law and section 454 of the Family Court Act prescribe a remedy, albeit drastic, to force financially able but obdurate spouses and parents to comply with orders of support to fulfill that fundamental obligation in Western civilization. A fortiori, as in the instant matter when the order vindicates the rights of the child.
Notwithstanding the fundamental interest of the child at stake and the present-day vigorous Federal and State programs of child support enforcement, imprisonment as a civil remedy to enforce compliance with an order of support remains a jurisprudential enigma and continues to vex jurists. Yet, section 245 of the Domestic Relations Law and section 454 of the Family Court Act have withstood substantive due process challenge. To avoid constitutional infirmity, however, willful disobedience is a prerequisite adjudication. (See United States ex rel. Griffin v Martin, 409 F2d 1300; Brooke v Family Ct., 420 F2d 296, cert den 397 US 1000; see, also, Bearden v Georgia, 461 US 660.) Willfulness in this context logically comprehends the ability to comply with the underlying order of support. In this regard, section 260.05 of the Penal Law, nonsupport of a child, provides an instructive analogy. An express constituent element of that crime is the ability to support. Indeed, does not the very nature of civil contempt as a coercive remedy in which the contemner carries the keys to the jail in his own pocket require a standard of ability to comply at the time of commitment to jail? Clearly, the answer must be in the affirmative.
New York State public policy provides a further limiting safeguard. Section 245 of the Domestic Relations Law *305 expressly states that before an application to hold a spouse or parent in contempt for nonpayment of a sum of money be considered, it must appear “presumptively” that payment cannot be otherwise enforced by sequestration, entry of a money judgment or a wage deduction order. That provision has been strictly construed. As enunciated in the leading case, Covello v Covello (68 AD2d 818) “Adjudication for contempt [for violation of an order requiring payments of money in a matrimonial action] may only be had where it appears presumptively to the satisfaction of the court that payment cannot be enforced by sequestration, requiring security or execution.”
Contrasted with section 245 of the Domestic Relations Law, section 454 of the Family Court Act does not contain the restrictive provision regarding contempt and imprisonment. Faced with a like special provision in section 236 of the Domestic Relations Law, the Court of Appeals held the provision applicable to the Family Court notwithstanding silence in the counterpart Family Court Act section. (Matter of Steinberg v Steinberg, 18 NY2d 492.) The reasoning in Matter of Steinberg v Steinberg (supra, at p 497) is equally compelling regarding the applicability of the subject “special provision” of section 245 of the Domestic Relations Law, particularly in the instant matter in which the parents have been divorced: “The public policy of the State is what the Legislature says it is, where the Legislature has spoken, and a policy so declared sometimes has to be followed by the courts in areas beyond the express reach of the statute for the sake of consistency in the administration of the law”. The public policy enunciated in section 245 of the Domestic Relations Law demonstrates the State’s adoption of the present-day jurisprudential attitude toward imprisonment for contempt as a remedy of last resort, and as such applies to section 454 of the Family Court Act.
The history of the law of contempt is a progression of substantive and procedural developments to safeguard the individual. Yet, “the life of the law,” Dean Pound tells us, “is in its enforcement.” (The Limits of Effective Legal Action, 3 Amer Bar Assn J 55, 77.) Respondent has willfully disobeyed the order of the court. That willful disobe *306 dience constitutes civil contempt. No other method of enforcement would be effectual. Of paramount significance, a less drastic remedy would but reinforce the father’s practice of refusing to support the child. Only the full use of the court’s contempt power will vindicate the child’s rights.
Respondent is committed to jail for civil contempt for a term not to exceed 60 days commencing on November 11, 1983. To avoid interference with the operation of respondent’s corporation, respondent shall serve that term Monday through Friday from 9:30 p.m. until 9:00 a.m. the following day, and from 9:30 p.m. Saturday evening until 9:00 a.m. the following Monday morning. Upon full compliance with the order of July 6, 1983, the order of commitment shall be suspended.
Order signed.[3]

. Detailed findings of fact deleted for purposes of publication.

. Findings of fact and conclusions of law were rendered on November 4, 1983, Respondent fully complied with the order two days before the scheduled date of commitment, and the order of commitment was thereby suspended.